IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| VINE STREET, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO. 6:03-CV-223 |
| vs. | § | |
| | § | |
| JAMES R. KEELING, as Independent | § | |
| Executor of the Estate of David Bart | § | |
| Keeling, Sr., Deceased; MAYTAG | § | |
| CORPORATION; BORG-WARNER | § | |
| CORPORATION; FEDDERS | § | |
| CORPORATION; and DOW | § | |
| CHEMICAL COMPANY, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION AND ORDER

Plaintiff Vine Street, LLC ("Vine Street") brought this action against Defendants James

R. Keeling, as independent executor of the estate of David Bart Keeling, Sr., deceased ("Keeling

Estate"), Maytag Corporation ("Maytag"), Borg-Warner Corporation ("Borg-Warner"), Fedders

Corporation ("Fedders"), and Dow Chemical Company ("Dow") (Borg-Warner, Fedders, and

Maytag referred to collectively as "Defendants" or "the remaining Defendants").[1]  The matter came

---

[1] In July 2005, the parties jointly agreed to dismiss Dow from this action (Docket No. 222). On the third day of trial in this case, the Court granted Vine Street's motion to dismiss its claims against the Keeling Estate (Docket No. 315).  In addition, Vine Street conceded in its Supplemental Proposed Findings of Fact and Conclusions of Law that "[t]he evidence in this case does not establish a 'sufficient nexus' between [sic] the activities of Defendant Maytag Corporation to create 'arranger' liability."  (Docket No. 349 at 1).  Although no party has moved to dismiss Maytag from the case, Vine Street's decision not to present evidence establishing Maytag's "sufficient nexus," which is required for both CERCLA and SWDA liability, effectively removes Maytag as a defendant.

In addition to dismissing all of Vine Street's claims against Dow and the Keeling Estate, the Court has dismissed or granted summary judgment against Vine Street on its claims against the remaining Defendants for contribution under 42 U.S.C. § 9613(f)(1), negligence / negligence per se, nuisance, trespass, lost rentals, diminution in value of property, and litigation-related attorneys' and retained experts' fees.  (See Docket Nos. 184, 230, 322).

for trial on the merits without a jury and was taken under submission.  After considering the testimony, exhibits, arguments of counsel, and supporting memoranda, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[2]

## BACKGROUND

Vine Street is a Texas corporation owned by various individual members of the Roosth family and managed by the Roosth Production Company, of which Steven C. Roosth is Vice President.[3]  Vine Street owns 914 West Glenwood Boulevard ("West Glenwood property") and 1604 South Vine Avenue ("South Vine property"), adjoining land parcels in Tyler, Texas.[4]  From 1949 through 1996, the Roosth Group, composed of individuals and trusts related to the Roosth family, and the Genecov Group, composed of individuals and trusts related to the Genecov family, jointly owned the West Glenwood property and at some point during this period owned and/or managed that property under the name B.M. & R. Interests.[5]

In 1961, the Roosth and Genecov Groups constructed a new building on the West Glenwood property specifically for use as a "Norge Laundry & Cleaning Village" facility by College Cleaners, a Tyler-area business owned and operated by David Bart Keeling, Sr. ("D.B. Keeling, Sr.").[6]  The

---

[2] To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

[3] Mar. 20, 2006 Trial Test. of Steven Roosth.

[4] *Id.*  Attached to this Order is Plaintiff's exhibit 60, a map of the properties at issue.

[5] Vine St. Exhibit 97C; Fedders Exhibits 1–3.

[6] Mar. 20, 2006 Trial Test. of James Keeling; Vine St. Exhibit 39 at 001940–001945; Vine St. Exhibit 40 at 001947; Vine St. Exhibit 104 (Jul. 12, 2005 Dep. of James Keeling ("J. Keeling 07/12/05 Dep.") at 13, 17).

construction included installation of sewer lines and other building utilities.[7]  Beginning in March

1961, the Roosth and Genecov Groups leased the West Glenwood property to "D.B. Keeling, d/b/a

College Cleaners and Washeteria and Laundry" to use as a laundromat and cleaners.[8]  The facility

housed Norge-manufactured commercial laundry equipment, including thirty washing machines, ten

dryers, and six-to-eight coin-operated, self-service, automatic dry-cleaning machines.[9]  College

Cleaners continuously operated the facility through a group of successive lease agreements with the

Roosth and Genecov Groups' respective trustees until November 1975.[10]  During this same period,

the South Vine property was used as a gasoline service station.[11]  Though both properties had

subsequent lessees and uses, the West Glenwood property was not used for dry-cleaning operations

before 1961 or after 1975, and the South Vine property was not used as a service station after 1980.[12]

In 1996, the Roosth and Gencov Groups partitioned all their jointly-owned properties,

including the West Glenwood property and transferred ownership of the property to Steven Roosth,

one of the Roosth family trustees.[13]  In 1998, the Rite-Aid pharmacy chain considered purchasing

the West Glenwood and South Vine properties and commissioned a series of environmental site

---

[7]Mar. 20, 2006 Trial Test. of James Keeling.

[8] Vine St. Exhibits 1–4.

[9] Mar. 20, 2006 Trial Test. of James Keeling ; Vine St. Exhibit 52; Vine St. Exhibit 100 (Excerpts From Jan. 20, 2004 Dep. of David Bart Keeling, Jr. ("D. Keeling, Jr. Dep.") at 9, 11).

[10] Mar. 20, 2006 Trial Test. of James Keeling; Vine St. Exhibits 1–4.

[11] Mar. 20, 2006 Trial Test. of Steven Roosth; Vine St. Exhibit 30 at 1111.

[12] *Id.*

[13] Fedders Exhibit 3 at 1220.  All of Steven Roosth's relevant actions were as a trustee to the Roosth family.

assessments.[14]  Rite-Aid ultimately declined to purchase the properties, and it is unknown why.[15]

In May 2001, Steven Roosth entered a contract with the M.M. Mitchell Family Partnership, LP, to purchase the then-vacant South Vine property.[16]  In anticipation of the acquisition, Steven Roosth commissioned an environmental assessment team to sample the soil and groundwater underlying the South Vine property for the presence of petroleum hydrocarbons.[17]  The assessment team found evidence of another substance in the soil and groundwater:  tetrachloroethylene (also known as perchloroethylene, trichloroethylene, "PCE," or "PERC"), a non-naturally-occurring, dense non-aqueous phase liquid chemical commonly found in dry-cleaning fluids.[18]  After further sampling of additional up-gradient locations on the South Vine property, the assessment team determined that the adjoining West Glenwood property was the source of the PERC contamination.[19]  The data indicated the presence of a PERC plume in the soil and groundwater, with the highest concentrations located near the exit of an underground drainage line at the former dry-cleaning facility.[20]

In July 2001—during the environmental assessments and after discovery of the contamination on both properties—Steven Roosth and the Mitchell Family Partnership amended the contract for sale of the South Vine Property.[21]  The nature of this amendment was not disclosed to the Court.  In

---

[14] Vine St. Exhibits 42 and 43.

[15] *See* Vine St. Exhibit 43 at 2019.

[16] Mar. 20, 2006 Trial Test. of Steven Roosth; Fedders Exhibit 5 at 001271.

[17] Mar. 20, 2006 Trial Test. of Steven Roosth; *see* Vine St. Exhibit 8 at 34.

[18] Mar. 21 Trial Test. of Keith O'Brien; Vine St. Exhibit 8 at 51, 86, 193.

[19] Vine St. Exhibit 8 at 41.

[20] *Id*.

[21] Fedders Exhibit 5 at 001271.

4

November 2001, Steven Roosth assigned Vine Street the right of purchase of the South Vine property.[22]  Soon thereafter, the Mitchell Family Partnership transferred ownership of the South Vine property to Vine Street by warranty deed.[23]  In February 2002, Steven Roosth transferred the West Glenwood property to Vine Street, retroactive to January 1, 2002.[24]

In March 2002, Vine Street notified what is now the Texas Commission on Environmental Quality ("TCEQ") of the contamination, applied to participate in the TCEQ's voluntary cleanup program,[25] and retained environmental consultants to prepare a comprehensive assessment of the contamination and a plan for its remediation.[26]  The TCEQ admitted Vine Street into the voluntary cleanup program in April 2002.[27]

Vine Street commenced this action in May 2003 by suing the Keeling Estate to recover the costs of such cleanup and remediation.  In 2004, Vine Street added Maytag, Fedders, and Borg-Warner as defendants.  Defendants each at one time or another exerted ownership over Norge, a leading manufacturer of dry-cleaning and laundry equipment from 1961 through 1975.[28]  Vine Street

---

[22] Fedders Exhibit 5 at 001271.

[23] Fedders Exhibit 5 at 001268–001274.

[24] *Id.* at 1217–18.

[25] *See* TEX. HEALTH & SAFETY CODE ("THSC") §§ 361.601 et seq.

[26] Mar. 20, 2006 Trial Test. of Steven Roosth; *see* Vine St. Exhibits 5, 6, 7, and 8 (TCEQ application and preliminary report); Vine St. Exhibits 34 and 35 (consultant assessments, work plan proposals, and TCEQ correspondences).

[27] Vine St. Exhibit 7 at 27.

[28] *See Vine St., LLC v. Keeling*, 361 F. Supp. 2d 600, 603 n.1 (E.D. Tex. 2005) (Davis, J.) ("*Vine Street I*").  From before 1961 to 1968, Borg-Warner controlled Norge as an operating division.  *See* Vine St. Exhibit 101 (Excerpts From Jun. 2, 2005 Dep. of William Cline ("Cline Dep.") at 29).  In 1968, Fedders purchased the Norge Division from Borg-Warner.  *See* Fedders Exhibit 14.  In 1979, Fedders sold the Norge Division to Magic Chef, Inc., which merged with Maytag in 1986.  *See* Vine St. Exhibits 74, 75, 77 & 78.

asserts that each Defendant is liable because each, through the Norge Division, provided defective equipment to D.B. Keeling, Sr.[29]

Vine Street contends that defective design of "water separators" in the laundromat's coin-operated Norge dry-cleaning machines led to the discharge of PERC-laden wastewater into the West Glenwood property's sewage drainage pipes, which allowed the PERC to corrode those pipes, escape into the surrounding soil, and contaminate the West Glenwood property and surrounding lots. The Roosth and Gencov Groups have assigned Vine Street their legal rights and interests in all existing and potential causes of action relating to the environmental contamination of properties conveyed to the Groups in the 1996 partition agreement.[30] The assignment is retroactively effective as of the date of the partition agreement.[31]

Vine Street seeks: (1) recovery of its "costs of response" to the PERC contamination, under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") (42 U.S.C. §§ 9601, et seq.), and the Texas Solid Waste Disposal Act (the "SWDA") (THSC §§ 361.001, et seq.); (2) a declaration of Defendants' responsibility for future response costs Vine Street incurs in monitoring and cleaning up the contamination under CERCLA Section 113(g) (42 U.S.C. § 9613(g)), the federal Declaratory Judgment Act (28 U.S.C. §§ 2201, et seq.), and the Texas Uniform Declaratory Judgments Act, (TEX. CIV. PRAC. & REM. CODE ("TCPRC") §§ 37.001, et seq.); (3) recovery of its attorneys' fees and expenses incurred in litigating this suit; and (4) all other costs and expenses of suit, including pre-judgment and post-judgment interest at the highest

---

[29] Pl.'s Seventh Am. Compl. ("Vine St.'s Compl.") at ¶¶ 3–5 (Docket No. 240 at 1–2).

[30] Vine St. Exhibit 98; Mar. 20, 2006 Test. of Steven Roosth.

[31] Vine St. Exhibit 98.

6

rates permitted by applicable law.  The Court has jurisdiction over Vine Street's federal claims

pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b) and over Vine Street's state-law claims

pursuant to 28 U.S.C. § 1367.

## LIABILITY

**CERCLA Liability**

Congress enacted CERCLA to encourage timely cleanup of hazardous waste sites by placing

cleanup costs on those responsible for creating or maintaining the hazardous condition.  *Consol.*

*Edison Co. v. UGI Utils.*, *Inc.*, 423 F.3d 90, 94 (2d Cir. 2005).  CERCLA also encourages private

parties to assume financial responsibility for such cleanups by allowing them to seek recovery from

others.  *Key Tronic v. United States*, 511 U.S. 809, 819 n.13 (1994).  Federal courts interpret

CERCLA liberally, consistent with Congress's "'overwhelming remedial' statutory scheme."[32]

This Court has already ruled that Vine Street may seek recovery of its response costs through

an implied right of contribution under CERCLA Section 107(a).[33]  Section 107(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses
set forth in subsection (b) of this section—
. . . .

(3) any person who by contract, agreement, or otherwise arranged for disposal or
treatment . . . of hazardous substances owned or possessed by such person, by any
other party or entity, at any facility or incineration vessel owned or operated by
another party or entity and containing such hazardous substances . . .

(4) . . . from which there is a release, or a threatened release which causes the
incurrence of response costs, of a hazardous substance, shall be liable for . . .

. . . .

[32] *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1380 (8th Cir. 1989) (quoting *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 733 (8th Cir. 1986) ("*NEPACCO*")) *cert. denied*, 484 U.S. 848 (1987).

[33] *Vine St., LLC v. Keeling*, 362 F. Supp. 2d 754, 760–61 (E.D. Tex. 2005) (Davis, J.) ("*Vine Street II*").

7

> (B) any . . . necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

42 U.S.C. § 9607(a). Thus, Vine Street must prove: (1) that the site in question is a "facility," (2) that there was a release or threatened release of a hazardous substance from the facility, (3) that the release or threatened release caused Vine Street to incur "necessary costs of response," and (4) that the particular Defendant is a responsible person ("PRP") under 42 U.S.C. § 9607(a).[34] The question of liability in this case centers around the determination of whether the Defendants are responsible persons under the statute, so the other elements are only briefly discussed.

A.  The West Glenwood laundromat building and property on which it sits are "facilities"

A "facility" is "(A) any building, structure, installation, pipe or pipeline (including any pipe into a sewer . . .) . . . or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9).  PERC derivatives—perchloroethylene, trichloroethylene, and tetrachloroethylene—are all hazardous substances under CERCLA.[35]  Steven Rooth's 2001 environmental study uncovered the presence of these substances on the South Vine and West Glenwood properties, and further studies establish their continued presence.[36]  Thus, the building and the property on which it sits are areas where a hazardous substance has come to be located, and they are both "facilities."

B.  There was a "release" of a hazardous substance from the West Glenwood property

"Release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging,

---

[34] *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989) (establishing the general prima facie elements of CERCLA liability); *see also N.J. Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 103–04 (3d Cir. 1999).

[35] *See* 42 U.S.C. §§ 9601(14)(B), 9602(a); 40 C.F.R. § 302.4(a).

[36] Vine St. Exhibit 8 at 41; Mar. 20, 2006 Trial Test. of Steven Roosth

injecting, escaping, leaching, dumping, or disposing into the environment."[37] 42 U.S.C. § 9601(22).

Release is construed broadly and does not have a quantitative requirement. *Amoco Oil*, 889 F.2d at

669. Vine Street's hydrogeological and forensic expert, Dr. Keith O'Brien, testified that a release

of PERC occurred from the laundromat building on the West Glenwood property.[38] O'Brien based

this testimony on his analysis of the property's historical uses, the groundwater's directional flow,

the property's topography and stratigraphy, and the PERC-contaminated soil and groundwater

samples from various monitoring wells.[39] Based on his experience investigating hundreds of PERC-

and petroleum hydrocarbon-contaminated sites, O'Brien testified that the only area locations where

PERC was likely to have been used were the West Glenwood laundromat and the South Vine service

station.[40]

Dr. Bruce Dale, a professor of chemical engineering at the University of Michigan with

expertise in biochemical engineering, corroborated O'Brien's testimony. Dale testified that because

(1) impermeable concrete and asphalt largely cover the West Glenwood and South Vine properties'

surfaces, and (2) the PERC would have quickly evaporated if spilled on the properties' few patches

of earth, the PERC could not have reached the monitoring well locations by seeping into the ground

from surface spills.[41]

Vine Street's sanitary engineering expert, Dr. Peter Krasnoff, testified that a cast-iron pipe,

---

[37] An "environment" is "any . . . surface water, ground water, drinking water supply, land surface or subsurface strata . . . within the United States." 42 U.S.C. § 9601(8).

[38] Mar. 21, 2006 Trial Test. of Keith O'Brien.

[39] *Id.*

[40] Mar. 21, 2006 Trial Test. of Keith O'Brien; Vine St. Exhibit 30 at 1111.

[41] Mar. 21, 2006 Trial Test. of Bruce Dale; *see* Vine St. Exhibit 37 (photographs of properties).

or "building drain" carried the building's PERC-laden wastewater to the cleanout location on the side of the building and then to a clay-pipe "sewer lateral" line that took the wastewater to the municipal wastewater collection system.[42]  Krasnoff further testified that if permitted to accumulate, PERC corrodes low-grade rubber of the type found in the building drain's joints, causing that rubber to swell, lose its structural strength, and fail in a manner of weeks or months.[43]  Vine Street's several expert and fact witnesses testified that the dry-cleaning machines' design and construction made discharge of PERC into the sewer system an inherent aspect of the machines' operation and made PERC's leakage into the soil and groundwater inevitable.

Defendants' expert in material science and engineering, Dr. Lee Swanger, reviewed the Norge manuals and generally corroborated Krasnoff's understanding of the machines' dry-cleaning process.[44]  Swanger disagreed with Krasnoff and Dale about the water's composition that the separator actually discharged to the sewer.  Based on his expertise, Swanger concluded that a properly-maintained water separator would emit wastewater containing at most only .015% PERC—a concentration far too low to allow the PERC to settle on the building drain's rubber joints.[45]  However, Swanger's testimony is less credible than Vine Street's experts' and fact witnesses' testimony.  Though Swanger claimed expertise in the separation and equilibrium of liquids, his primary expertise is in the area of mechanical engineering, with a focus in the automotive

---

[42] Mar. 21, 2006 Trial Test. of Peter Krasnoff.

[43] *Id*.

[44] Mar. 22, 2006 Trial Test. of Lee Swanger; *see* Fedders Exhibit 18 at M002627–M002630.

[45] Mar. 22, 2006 Trial Test. of Lee Swanger.

industry.[46]   Swanger lacks Krasnoff's experience in wastewater engineering and the design of wastewater equipment as they relate to liquid/liquid separation systems.[47]   Further, Swanger could not cite to a peer-reviewed published source supporting his methodology in determining that a properly-maintained Norge water separator would function with 99.985% efficiency.[48]

The Court finds that the water separators of the Norge dry-cleaning machines at the West Glenwood laundromat discharged PERC to the sewer in such quantities as to corrode the building drain's rubber joints, leak into the subsurface, and contaminate the surrounding soil and ground water.  Based on this evidence, the Court concludes that there was a "release" of PERC at the West Glenwood property.

C.   The release caused Vine Street to incur "necessary costs of response"

The release or threatened release of the hazardous substance must "cause[] the incurrence of response costs." 42 U.S.C. § 9607(a)(4); *see*, *e.g.*, *Amoco Oil*, 889 F.2d at 668 (synthesizing the section's distinct clauses into one element).  Response costs are costs incurred in relation to assessing, monitoring, cleaning, and removing released hazardous substances, minimizing damage to the public health or environment from the hazardous substances, and achieving a permanent remedy.[49]

Vine Street submitted updated post-trial invoices of costs for physical site assessments, drilling monitoring well borings and taking soil samples, continued on-site and laboratory

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *See* 42 U.S.C. § 9601(23)–(25) (defining "response," "remove," "remedy," and "removal action").

stratigraphic and groundwater evaluation and testing, project consultant work, application for the TCEQ cleanup program and TCEQ fees, and various municipal fees related to sewer access and waste disposal.[50]   Such costs—or at least those costs incurred after Vine Street's consultants discovered PERC on the South Vine property—are necessary to monitor, assess, and evaluate the environmental threat from the PERC's release.  These activities constitute a removal action under CERCLA Section 101(23).  *Tanglewood E. Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1575 (5th Cir. 1988).

Because the statute expressly provides for recovery of costs of a removal action, a CERCLA plaintiff need not show that it incurred actual *cleanup* costs in order to recover.  *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir. 1986); *Marriott Corp. v. Simkins Indus., Inc.*, 825 F. Supp. 1575, 1581–82 (S.D. Fla. 1993).  Thus Vine Street has demonstrated that it incurred response costs through this removal action.

In addition, "necessary costs" are costs expended in response to an actual and real threat to public health or the environment, as opposed to a merely theoretical threat.[51]  Vine Street submitted substantial evidence regarding PERC's potential detrimental health effects, which include headache, nausea, central nervous system impairment, liver and kidney cancers, and leukemia.[52]  Defendants offered no argument to rebut Vine Street's evidence that the PERC's established release constitutes

---

[50] *See generally* Vine St. Exhibit 103.

[51] *Amoco Oil*, 889 F.2d at 669–70 ("[T]o justifiably incur response costs, one necessarily must have acted to contain a release threatening the public health or the environment"); *see also Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir. 2001) (en banc) ("*Carson Harbor I*")

[52] Vine St. Exhibit 8 at 87.

an actual and real public health threat.[53]   Nor did Defendants present evidence to suggest Vine

Street's site investigations and assessments were for purposes other than responding to that actual

and real threat.   Therefore, Vine Street has demonstrated that it incurred necessary response costs

as required under CERCLA.

    D.    <u>Borg-Warner is a "Responsible Person" under the statute; Fedders is not a</u>
<u>"Responsible Person" under the statute</u>

The primary element at issue in this case is whether the Defendants are responsible persons

under the statute.[54]   Vine Street alleges that Borg-Warner and Fedders are each arrangers as defined

by the statute.[55]   To satisfy arranger liability, Vine Street must demonstrate (1) the Defendants are

persons; (2) who by contract, agreement or otherwise; (3) arranged for the disposal; (4) of hazardous

substances; (5) owned or possessed by such person, by any other party or entity; (6) at a facility; (7)

owned or operated by another party or entity; (8) containing such hazardous substances.  *See* 42

U.S.C. § 9607(a)(3).

The Court has previously determined that PERC is a hazardous substance; that the property

at issue is a facility as defined by the statute; and that PERC was found on the property at issue.   In

---

[53] *See* 40 C.F.R. § 302.4(a); *see also* Vine St. Exhibit 85 at DCVIN000693– DCVIN003694; Fedders Exhibit 51 and 53 (Am. Ins. Ass'n Chem. Hazards Bulletins); Fedders Exhibit 54 at DEW01380–DEW01382 (Nat'l Safety Council data sheet on perchloroethylene).

[54] There are four categories of "potentially responsible persons" ("PRPs") under subsection 42 U.S.C. § 9607(a). Vine Street only argues that the Defendants fall within the "arranger" category in subsection (a)(3).  A defendant can be an arranger if:  (1) it arranges for disposal or treatment of a hazardous substance, or (2) arranges with a transporter for disposal or treatment of a hazardous substance.  Vine Street alleges arrangement via "disposal of a hazardous substance"

[55]  42 U.S.C. § 9607(a)(3) defines an arranger as a  "person[s] who by contract, agreement, or otherwise arranged for disposal . . . of hazardous substances  owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances."

addition, it is undisputed that Borg-Warner and Fedders are "persons" for purposes of the statute;[56] and that the property at issue was owned or operated by another party.[57]   The remaining elements— two, three, and five—are discussed herein.

> 1.    *By contract, agreement, or otherwise / imputation of liability*

To satisfy the requirements of arranger liability, Vine Street must first establish some legal mechanism to link Borg-Warner or Fedders to acts that constitute "arrangement."  Vine Street alleges only that Borg-Warner and Fedders are "successors in interest to Norge."[58]   Thus, Vine Street concedes that because neither Borg-Warner or Fedders directly arranged for the PERC's disposal, the Court must impute Norge's CERCLA liability (if any exists) to each of those Defendants in order to hold them liable.[59]

> a.    Borg-Warner's liability for Norge

The parties dispute whether Norge itself constructed, marketed, delivered, or installed the dry cleaning machines at issue, as well as whether Norge employees actually plumbed the machines to the sewer and instructed College Cleaners personnel as to the machines' use.  However, Borg-Warner admits that it owned Norge as an operating division during the time that Vine Street alleges

---

[56]A "person" is "an individual, firm, corporation, association, partnership, consortium, joint venture, [or] commercial entity." 42 U.S.C. § 9601 (21).

[57] It is undisputed that at one time or another the Roosth and Genecov Groups, Steven Roosth as trustee for the Roosth family, and Vine Street each exerted ownership over the West Glenwood property and the building that sits on it.  It is likewise undisputed that none of the Defendants ever owned or operated those facilities.

[58] Vine St.'s Compl. at ¶ 37 (Docket No. 240 at 9).

[59] Vine Street ignored the Court's order for post-trial briefing on this issue.  Vine Street's supplemental post-trial submission, which combined proposed findings of fact and conclusions of law with dedicated legal briefing, simply listed the words "[n]ot applicable" when referencing the Court's directive (Docket No. 349 at 11).  Accordingly, Vine Street waived any argument on this issue.

Norge engaged in these activities.[60]  These alleged activities are the gravamen of Vine Street's allegations that Borg-Warner and Fedders arranged for disposal of PERC.  Thus, Borg-Warner's potential liability stems from the fact that it owned the Norge Division during the period when the alleged activities occurred, not from any alleged status as a corporate successor.[61]

> b.    Imputing Norge's liability (if any) to Fedders

Fedders admits that it owned Norge as an operating division, but not during the time of the alleged "arrangement."[62]  Fedders correctly states that "there is no evidence or even a claim that Norge machines were sold to College Cleaners after 1961 or that any Norge entity had anything to do with the College Cleaners location after 1961."[63]  Vine Street neglected to articulate its theory of Fedders's successor-in-interest liability.  Therefore, Vine Street does not dispute Borg-Warner and Fedders's contention that "Fedders could only be liable to Plaintiff under CERCLA . . . if (1) Borg[-]Warner is first liable to Plaintiff under [CERCLA] and (2) Fedders is deemed to have successor liability for [the] conduct of Borg[-]Warner."[64]

---

[60] *See* Def. Borg-Warner Corp.'s Second Am. Answer at ¶ 4 (Docket No. 255 at 2).

[61] Borg Warner has stipulated "without admitting liability or anything else," that it is the "proper company . . . before the Court."  Vine St. Exhibit 101 (Cline Dep. at 4) (statement of Kenneth Baker, counsel for Borg-Warner).

[62] *See* Def. Fedders Corp.'s Second Am. Answer at ¶ 5 (Docket No. 251 at 2).

[63] Fedders's Supp. Post-Trial Br. at 12. *See also Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 n.1 (6th Cir. 1995) (citing 19 AM. JUR. 2D *Corporations* § 2726 (1986)) (applying Ohio law and holding that "[w]hether an entity bears successor liability determines whether that entity can be directly liable to persons harmed by its predecessor's conduct").

[64] Borg-Warner and Fedders each argue that Fedders can only be held liable on a theory of successor liability but arrive at opposite conclusions about whether Fedders is in fact liable under such theory.  *See* Def. Borg-Warner's Corp.'s Supp. Post-Trial Briefing ("Borg-Warner's Supp. Post-Trial Br.") at 12–16 (Docket No. 348); Def. Fedders Corp.'s Supp. Post-Trial Briefing at 12–15 ("Fedders's Supp. Post-Trial Br.") (Docket No. 343).

*(i) Applicable law*

Courts unanimously recognize corporate successor liability under CERCLA.[65] Borg-Warner and Fedders agree that most circuits apply a federal common law of CERCLA successor liability, that district courts within the Fifth Circuit also apply this "majority rule," and that though the Fifth Circuit has never directly spoken to the issue of CERCLA successor liability, the Court should adopt such rule here.  According to Borg-Warner and Fedders's agreed formulation, the general corporate successor liability rule is that a corporation that acquires the assets of another corporation is liable for the transferor's obligations only when (1) the asset purchaser expressly or impliedly agrees to assume the transferor's liabilities; (2) the transaction amounts to a consolidation or *de facto* merger; (3) the purchasing corporation is a mere continuation of the transferor; or (4) the parties entered into the transaction fraudulently to escape liability.[66] *Monzingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985).  This formulation, as a generally-recognized traditional rule of corporate law, is applied to CERCLA.[67]

---

[65] *United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294, 298 & n.3 (3d Cir. 2005) (citing cases) (agreeing that CERCLA incorporates unaddressed common law principles of successor liability); *see, e.g.*, *United States v. Mex. Feed & Seed Co.*, 980 F.2d 478, 486 (8th Cir. 1992) (finding successor liability to be implicit in CERCLA and consistent with Congress's goal of having parties who created or maintained hazardous conditions bear cleanup costs); *Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1246 (6th Cir. 1991) (noting the "universal acceptance" of corporate successor liability and interpreting CERCLA to encompass such liability); *Smith Land & Improvement Corp. v. Celotex*, 851 F.2d 86, 92 (3d Cir. 1988) (recognizing CERCLA successor liability).

[66] Borg-Warner's Supp. Post-Trial Br. at 13 (citing *N. Shore Gas Co. v. Salomon, Inc.,* 152 F.3d 642, 649 (7th Cir. 1998); *Mex. Feed & Seed*, 980 F.2d at 486; *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992); *United States v. Lang*, 864 F. Supp. 610, 613 (E.D. Tex. 1994) (Cobb, J.); *Tex Tin Corp. v. United States*, 2006 WL 1118587, at *4 (S.D. Tex. Apr. 25, 2006)); Fedders's Supp. Post-Trial Br. at 13 (citing *Gen. Battery*, 423 F.3d at 298; *Lang* , 864 F. Supp. at 613; *Tex Tin Corp.*, 2006 WL 1118587, at *4).

[67] *See New York v. Nat'l Serv. Indus*, *Inc.*, 352 F.3d 682, 685 (2d Cir. 2003); *Carolina Transformer*, 978 F.2d at 838; *Polius v. Clark Equip. Co.*, 802 F.2d 75, 77–78 (3d Cir. 1986).

Borg-Warner and Fedders agree that the relevant inquiry is whether Fedders expressly or impliedly assumed Borg-Warner's liabilities for Borg-Warner's pre-1968 conduct.  Borg-Warner and Fedders also agree that the answer to whether Fedders agreed to assume Borg-Warner's liabilities hinges on their 1968 agreement to transfer Borg-Warner's interests in Norge (the "1968 Norge Purchase Agreement") and their 1981 settlement covering certain Norge-related "product liability claims" (the "1981 Settlement Agreement").[68]

One court found "many precedents for the proposition that CERCLA liability can be assumed by a pre-CERCLA agreement so long as the agreement contains 'language broad enough . . . to say that the parties intended to transfer either contingent environmental liability, or all liability.'"[69]  The *Iron Mountain II* court also found that federal courts "universally have held that language transferring 'all liabilities' is sufficiently broad to include environmental liability" and likewise have held that the only exception to this principle is "where other clauses in or attachments to the agreement make it clear that the parties did not intend to include environmental liabilities."  *Iron Mountain II*, 987 F. Supp. at 1241 (citing cases)

*(ii) Application*

Borg-Warner contends that a collection of "key sentences" from Section 6 of the 1968 Norge Purchase Agreement "are broad enough to" demonstrate that Fedders assumed Borg-Warner's CERCLA liabilities.

---

[68] *See* Fedders Exhibit 14 (Norge Purchase Agreement); Borg-Warner Exhibit 1 (1981 Settlement Agreement).

[69] *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1233, 1241 (E.D. Cal. 1997) ("*Iron Mountain II*") (quoting *John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 406 (1st Cir. 1993) (applying Massachusetts law to interpret a pre-CERCLA agreement)); *accord Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 565 (3d Cir. 1997) (applying Delaware and Pennsylvania law alternatively to interpret a pre-CERCLA agreement).

The first sentence Borg-Warner references from the section ("Sentence 1") provides:

> Buyer hereby assumes and agrees to perform, and agrees to indemnify and hold Seller free and harmless from all obligations which shall arise after the Closing Date under, any contract, license, lease commitment, sales order or purchase order which either is listed or referred to in any Exhibit hereto or relates to the business of [the Norge] Division but is not required to be listed in any Exhibit hereto pursuant to the provisions hereof.[70]

Sentence 1 is irrelevant to whether Fedders is liable to Vine Street for Borg-Warner's imputed pre-1968 conduct because it only refers to Borg-Warner's contractual obligations and does not mention Borg-Warner's liabilities.  There is no reasonable argument that the provision refers to Borg-Warner's liabilities.

The second sentence Borg-Warner quotes ("Sentence 2") states:

> Buyer will also assume, and will indemnify and hold Seller free and harmless from, all liabilities of Seller, absolute or contingent, under any warranty, guarantee, finance company recourse obligations (including those listed in any Exhibit hereto), indemnity or other obligation given or incurred in connection with the sale, lease or service of products of [the Norge] Division in the ordinary course of business of [the] Division prior to the Closing Date and as to which suit has not been commenced prior to the Closing Date.[71]

Under this provision, Fedders expressly assumes some of Borg-Warner's liabilities that arise under warranties, guarantees, finance company recourse obligations, indemnities, and other obligations that Borg-Warner incurred in connection with the sale of Norge products prior to the closing date.  Borg-Warner makes no argument that these liabilities encompass Vine Street's CERCLA and the SWDA claims against Borg-Warner.  Vine Street does not invoke any theory of recovery based on breach of warranty, guarantee, or other obligation.  To the extent that Fedders assumed Borg-Warner's

---

[70] Fedders Exhibit 14 at M001458.

[71] *Id.*

liabilities under Sentence 2, the scope of those assumed liabilities is far too narrow to encompass

Vine Street's claims.  Sentence 2 cannot serve as a basis for Fedders's CERCLA successor liability.

Finally, Borg-Warner quotes the following sentence ("Sentence 3"):

> In addition, Buyer hereby agrees to indemnify Seller against and hold it harmless
> from, all liability arising out of suits, proceedings, demands, judgments, expenses
> (including counsel fees) and costs which Seller may suffer or incur by reason of the
> failure of Buyer so to pay, perform and discharge such obligations and liabilities of
> Seller or injury or loss suffered or alleged to have been suffered by any customer of
> products sold by [the Norge] Division arising out of the sale to Buyer of the business,
> properties and assets contemplated by this Agreement or by any person out of any
> action taken by Buyer on or after the Closing Date.[72]

As mentioned, Vine Street does not allege that it suffered harm from any action Fedders took "on

or after" July 1, 1968.  Thus, the portion of Sentence 3 referring to "injury or loss suffered or alleged

to have been suffered . . . by any person out of any action taken by Buyer on or after the Closing

Date" cannot be the source of Fedders's CERCLA successor liability.  Likewise, none of the parties

allege that Borg-Warner has "suffer[ed] or incurr[ed]" any "liability arising out of suits, [etc.]" by

reason of Fedders's "failure . . . to pay, perform and discharge such obligations and liabilities" of

Borg-Warner that "ar[ose] out of the sale to [Fedders] of the business, properties and assets

contemplated by" the 1968 Norge Purchase Agreement.  Borg-Warner contends only that Fedders

succeeds to whatever CERCLA "arrangement" liability Borg-Warner may have—not by virtue of

Fedders's failure to perform an obligation, but by Fedders's express assumption of such liability.

Thus, this portion of Sentence 3 cannot be the source of Fedders's CERCLA successor liability.

Sentence 3 articulates Fedders's promise to indemnify and hold Borg-Warner harmless from

"all liability arising out of suits . . . which [Borg-Warner] may suffer or incur by reason of . . . injury

---

[72] *Id.* at M001458–M001460.

or loss suffered or alleged to have been suffered by any customer of products sold by [the Norge] Division [that arises] out of the sale to [Fedders] of the business, properties and assets contemplated by" the 1968 Norge Purchase Agreement.  This language covers liability arising out of Borg-Warner's sale of Norge itself and is not broad enough to make Fedders liable to Vine Street for products that Norge sold years before the agreement.[73]

Even if the 1968 Norge Purchase Agreement and 1981 Settlement Agreement shifted the ultimate risk of Borg-Warner's liability to Fedders for any "arrangement" that Vine Street establishes Norge committed under CERCLA or otherwise obligate Fedders defend Borg-Warner, these agreements do not reflect Fedders's express or implied assumption of Borg-Warner's CERCLA liability as a corporate successor.  Vine Street has articulated no legal mechanism through which Fedders may be held liable for Norge's alleged acts of arrangement, and Fedders did not assume this liability as a corporate successor.  Therefore, Fedders is not an arranger and is not liable to Vine Street under CERCLA.

### 2.    Defendant arranged for disposal

To establish arranger liability, Vine Street must next demonstrate that Borg-Warner "arranged" for the disposal of hazardous substances.  For the Court to find that Borg-Warner

---

[73] Even if Sentence 3 were broad enough to obligate Fedders to indemnify and hold Borg-Warner harmless for Borg-Warner's CERCLA and SWDA liabilities, nothing in the provision reflects Fedders's express agreement to *assume* any of Borg-Warner's liabilities under common law principles of CERCLA corporate successor liability. Contractual indemnity for liabilities and assumption of liabilities under the doctrine of successor liability are very different.  Just as an indemnity agreement does not relieve a party from its underlying liability to a CERCLA claimant seeking response costs, *Iron Mountain* II, 987 F. Supp. at 1241 n.16 (citing *Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400, 404 (3d Cir. 1995)), the Court is unaware of any legal authority that an indemnity agreement—by itself and without contemporaneous reference to an *assumption* of liabilities—expressly or impliedly *creates* a party's direct liability to such a claimant.  There is no evidence that the parties intended Fedders's indemnity pledge to imply assumption of liability, or that the terms "indemnify" and "hold harmless" mean something other than their ordinary meaning.

arranged for the disposal of hazardous substances, there must be "some nexus between" Borg-Warner and the PERC's disposal. *See Geraghty & Miller, Inc. v. Conoco, Inc.,* 234 F.3d 917, 929 (5th Cir. 2000); *N.J. Turnpike Auth.*, 197 F.3d at 105; *Gen. Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992).

a. Applicable law

The Fifth Circuit rejects "a bright-line test for determining when one is an arranger" and liberally interprets the term "arranged." *Geraghty & Miller*, 234 F.3d at 929. Determining arranger liability is a fact-intensive inquiry. *Morton Int'l Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 677 (3d Cir. 2003). Courts therefore engage "in a case-by-case analysis of arranger liability, relying upon many factors," none of which are necessarily dispositive, to determine whether a sufficient nexus exists. *Sea Lion, Inc. v. Wall Chem. Corp.*, 974 F. Supp. 589, 595 (S.D. Tex. 1996); *see S. Fla. Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 406–07 (11th Cir. 1996). Some of these factors include whether the defendant (1) engaged in a transaction for the purpose of waste disposal, (2) owned or possessed the waste, (3) had some actual involvement in the decision to dispose of the waste, or, alternatively had an obligation to control the disposal of the waste, (4) and/or controlled the waste's disposal regardless of whether it owned or possessed the waste. *Vine Street I*, 361 F. Supp. 2d at 606. There is no Fifth Circuit precedent as to which factors must be considered or what priority they should receive. *See Morton Int'l*, 343 F.3d at 677. The Court's ultimate decision as to arranger liability must be based on "the totality of the circumstances." *Geraghty & Miller*, 234 F.3d at 929.

In addressing a SWDA arranger liability provision almost identical to CERCLA's, the Texas Supreme Court held that "the courts' inquiry should focus on the degree of the defendant's actual control over the decision regarding the specific method or manner of disposal." *R.R. St. & Co., Inc.*

21

*v. Pilgrim Enter., Inc.,* 166 S.W.3d 232, 243 (Tex. 2005) ("*R.R. Street II*").  In *R.R. Street II*, Pilgrim,

a dry-cleaning company, sought to recover soil and groundwater cleanup costs for its numerous dry-

cleaning facilities whose sewer lines had leaked PERC.  *Id.* at 237.  Street, Pilgrim's dry-cleaning

equipment supplier, designed, manufactured, and distributed Pilgrim's dry-cleaning equipment; sold

both the equipment and PERC directly to Pilgrim; supervised the equipment's installation;

periodically performed equipment inspections; and routinely advised Pilgrim to discard PERC-

contaminated wastewater into the sewer.  *Id.* at 236–37; *R.R. St. & Co. v. Pilgrim Enters., Inc.*, 81

S.W.3d 276, 289 (Tex. App.—Houston [1st Dist.] 2001) ("*R.R. Street I*"), *rev'd on other grounds*,

166 S.W.3d at 255.

     In determining the arranger liability, the court noted that looking to actual control "provides

some degree of uniformity under the law, while at the same time allowing courts to consider the

totality of the circumstances presented in any given case."  *R.R. Street II,* 166 S.W.3d at 244.

Applying this standard, the Texas Supreme Court found that these activities were insufficient to

create a nexus between Street's conduct and the PERC's disposal because "Street did not actually

control the *specific method and manner* in which Pilgrim disposed of the separator water" and had

no "obligation with regard to waste disposal decisions"  *Id.* at 246 (emphasis added).  Pilgrim

remained free to ignore Street's advice and thus "never ceded ultimate control over this aspect of its

operations" or the "authority to make disposal decisions."  *Id.*

     Similarly, in *Berg v. Popham*, the Bergs alleged that the water separators on their Norge dry-

cleaning machines flushed PERC-laden separator water into the local sewer lines, causing leaks and

soil contamination.  113 P.3d 604, 606 (Alaska 2005) ("*Berg II*").  Articulating the applicable

standards for the Ninth Circuit, the Alaska Supreme Court held that the Alaska environmental statute

requires an arranger to have "substantial or integral . . . actual involvement in the decision to dispose

of waste." *Id.* at 610.  The court stated that actual involvement "can encompass involvement in

deciding *how* to dispose of waste or in facilitating such disposal," which can, "in turn, include

actions such as designing, installing, or connecting a system that disposes of waste on behalf of a

third party." *Id.*  The court believed the "actual involvement" standard to be broader than the Ninth

Circuit's requirement that a CERCLA arranger own or possess the hazardous substance or have

authority to control its disposal. *Id.* at 609 n.20.  Nevertheless, the court held that the "actual

involvement" standard comports with most federal interpretations of CERCLA arranger liability.

*Id.* at 609–10 & n.27 (citing *Gen. Elec.*, 962 F.2d at 286).  Applying this standard, the Ninth Circuit

held the Bergs' allegations that Norge required the PERC's use in the dry-cleaning equipment,

designed the layout of the equipment, and installed equipment with separator systems that

"facilitated spillage, leakage and direction of [PERC] into the city sewer system" sufficient to

overcome Maytag's motion to dismiss.  *Berg v. Popham*, 412 F.3d 1122, 1129 (9th Cir. 2005)

(internal quotes omitted)("*Berg II*").

In *California Department of Toxic Substances v. Payless Cleaners*, the Peters owned property

from which PERC was released when a dry-cleaning business operated a Norge Village franchise

on the property.  368 F. Supp. 2d 1069, 1074 (E.D. Cal. 2003).  The Peters brought a third-party

complaint against Maytag, alleging that Norge manufactured and provided the dry-cleaning

equipment and PERC used on the property, installed machines that discharged PERC-laden

wastewater through floor-piping connected to the local sewer, and determined the facility's layout,

specifically considering the location of floor drains for wastewater disposal. *Id.* at 1074–77.  On a

motion to dismiss, the court found that Norge's alleged design of the machines and instruction-

manual directions on wastewater disposal, by themselves, could not establish Norge's actual control over the ultimate decision on how to dispose of the PERC. *Id*. at 1080. However, the court denied dismissal, finding that Norge's alleged role in designing the facility's layout (which required the machines' connection to the floor-piping system) and subsequent annual inspections could establish such control. *Id.* On such facts, "the Peters did not exercise independent decisionmaking regarding the disposal, but rather, at the very least, shared this control with [Norge]." *Id.* Moreover, the court found Norge's alleged physical installation and connection of the machines to the floor-piping system even more compelling to establish its control over the disposal. *Id*.

   b. Application

  In the instant case, James Keeling was a College Cleaners employee in 1961. Keeling's job was to collect laundry from various drop-off points for delivery to the main plant for commercial dry cleaning.[74] Though Keeling did not actually work at the West Glenwood laundromat, he was the witness most familiar with the laundromat's operations.[75] Despite Borg-Warner's attempts to characterize Keeling's recollections as unreliable, Keeling gave a generally consistent and detailed description of Norge's involvement with the laundromat.

  Norge representatives likely approached D.B. Keeling, Sr. at a dry-cleaning convention about opening up a self-service Norge Laundry & Cleaning Village.[76] In the early 1960s, Norge advertised Norge Laundry & Cleaning Villages nationally as investment opportunities for local businessmen.[77]

---

[74] Mar. 20, 2006 Trial Test. of James Keeling.

[75] *Id*.

[76] *Id*.; Vine St. Exhibit 104 (J. Keeling 07/12/05 Dep. at 70)

[77] Vine St. Exhibit 41 at 001954.

The Roosth and Genecov Groups constructed the West Glenwood laundromat building for College Cleaners according to Norge's designs and layout specifications and under Norge's supervision.[78] All of the washers, dryers, and dry-cleaning machines at the facility were Norge machines.[79] Although College Cleaners may have bought the actual equipment from an independent Norge dealer or distributor, the facility itself sported Norge colors, signs, and logos.[80]

Before the facility's grand opening, Keeling helped unload the actual dry-cleaning machines that Norge mechanics delivered to the facility.[81] Keeling witnessed these workers install the equipment and plumb the machines to drains leading to the building's sewer lines.[82] Keeling also witnessed Norge workers fill the machines' solvent circulation tank system with initial supplies of PERC, which they had brought, and test the machines to ensure they functioned correctly.[83]

Norge advertised the laundromat's grand opening in the Tyler newspapers, and, because the laundromat was Texas's first Norge Laundry & Cleaning Village, three or four Norge corporate representatives attended the facility's grand opening and instructed customers on how to operate machines.[84] During the laundromat's operative years, Norge trained the attendants who maintained the equipment and required those attendants to wear smocks bearing the Norge colors and logo.[85]

---

[78] Mar. 20, 2006 Trial Test. of James Keeling.

[79] Vine St. Exhibit 104 (J. Keeling 07/12/05 Dep. at 28).

[80] Mar. 20, 2006 Trial Test. of James Keeling; Vine St. Exhibit 40 at 001947.

[81] Mar. 20, 2006 Trial Test. of James Keeling; Vine St. Exhibit 104 (J. Keeling 07/12/05 Dep. at 38–39, 58).

[82] Mar. 20, 2006 Trial Test. of James Keeling; Vine St. Exhibit 104 (J. Keeling 07/12/05 Dep. at 62, 67).

[83] Mar. 20, 2006 Trial Test. of James Keeling.

[84] *Id.*; Vine St. Exhibit 104 (J. Keeling 7/12/05 Dep. at 64–65, 67–78).

[85] Mar. 20, 2006 Trial Test. of James Keeling; Vine St. Exhibit 104 (J. Keeling 07/12/05 Dep. at 61).

Keeling recalled no spills or intentional disposals of PERC that occurred and indicated College Cleaners personnel handled the rather expensive PERC with a high degree of care.[86]  There is no evidence that the machines suffered from a manufacturing defect or were improperly maintained.

Norge's level of input into and control of the facility's design and layout, its installation of the equipment and plumbing of the machines to drains leading directly to the building's sewer lines, its workers' installation and testing of the facility's equipment, its corporate representatives' degree of participation in the facility's opening, its training of the facility's attendants, its requirements for displays of signs, colors, and logos, and College Cleaners' own identification of the facility as a "Norge Laundry & Cleaning Village"—a term which Norge itself seems to have accorded specific meaning—indicate that College Cleaners and Norge had a franchise- or franchise-like agreement.[87] That College Cleaners may have bought the actual machines through a distributor does not change this finding; Norge apparently required distributors to whom it furnished equipment to help facilitate franchise agreements.[88]

Given Norge's substantial involvement in the design of its franchise and the machines' actual installation, College Cleaners had no practical choice as to how to dispose of the wastewater, irrespective of whether it had any reason to suspect that the wastewater would inherently contain PERC.  Flushing the wastewater to the sewer was not a recommendation or advice, unlike Street's

---

[86] Mar. 20, 2006 Trial Test. of James Keeling.

[87] *See* Vine St. Exhibit 40 at 001947; Vine St. Exhibit 41 at 001954; Fedders Exhibit 14, Attachment G at M001686 (form Norge Village License and Franchise Agreement).

[88] Fedders Exhibit 14, Attachment G at M001645.

activities in *R.R. Street II*, but rather an integral part of Norge's design for the dry-cleaning system.[89] Norge's activities here demonstrate that it had the authority to and did exercise actual control over the specific method and manner of the PERC's disposal.[90]  Norge was actually involved in deciding how to dispose of that wastewater and the PERC contained therein.[91]

Moreover, there is at least some evidence that Norge actually knew its water separators would discharge PERC.  Later Norge dry-cleaners models' wastewater hoses apparently had "'trap[s]' to prevent solvent flow to the floor drain," and the machines' manuals instructed that "under no circumstances [should one] alter the hose or omit the [hose's] formed loop."[92]  The manuals instruct that in the case of low solvent mileage, one should check the water separator drain hose for proper positioning.[93]

A defendant's "knowledge that hazardous waste disposal is an inherent or inevitable part of the process" the defendant has arranged "demonstrates that the defendant knowingly (if not personally) contributed to the hazardous-waste contamination . . . . [and] may suffice to establish liability."  *Morton Int'l*, 343 F.3d at 679 (citing *Aceto*, 872 F.2d at 1384).  The later manuals permit the unrefuted inference that, at least as early as 1964, Norge engineers actually knew of and attempted to compensate for the separators' inefficiency and tendency to discharge PERC with the

---

[89] *See* Mar. 21, 2006 Trial Test. of Peter Krasnoff; Vine St. Exhibit 80 at M002370 (figure 7), M002462; Vine St. Exhibit 100 (Warren Dep. at 111).

[90] *See Payless Cleaners*, 368 F. Supp. 2d at 1078 (citing *United States v. Shell Oil Co.*, 294 F.3d 1045, 1050 (9th Cir. 2002)); *R.R. Street II*, 166 S.W.3d at 246.

[91] *See Berg II*, 113 P.3d at 610.

[92] Vine St. Exhibit 72 at M001243 (1973 model's manual); Vine St. Exhibit 80 at M002466 (1964 model's manual).

[93] Vine St. Exhibit 72 at M001243; Vine St. Exhibit 80 at M002510.

27

wastewater.  This further strengthens the nexus between Norge and the PERC disposal.

Finally, James Keeling's unrebutted testimony that Norge supplied and initially filled the dry-cleaning system with PERC also strengthens the nexus because it establishes that Norge owned or possessed at least some of the actual hazardous substance that entered the sewers.

Based on the totality of the circumstances, the nexus between Norge and the PERC disposal establishes that Norge arranged for that disposal.[94]  Because Borg-Warner was Norge's corporate parent at the time of Norge's critical acts that gave rise to the arrangement, the Court concludes that Borg-Warner arranged for the PERC's disposal.

### 3.  Owned or possessed by such person, by any other party or entity

The final element at issue regarding arranger liability is whether Norge must have actually owned the PERC or whether it could have been owned by another party or entity.  Borg-Warner and Vine Street construe the statutory language differently.  Vine Street contends that the phrase in the definition of arranger, "by any other party or entity," modifies the preceding words "owned or possessed by such person," and thus any person is liable who arranges for disposal of a hazardous substance "owned or possessed by such person, *or* by any other party or entity."  In other words, Vine Street construes the phrase to mean that Norge did not have to actually own the PERC that went into the dry-cleaning machines in order to be an arranger.  Borg-Warner construes the phrase to modify the words "disposal or treatment:"  "any person who . . . arranged for disposal or treatment

---

[94] CERCLA adopts the federal Solid Waste Disposal Act's (the "FSWDA") definition of "disposal:"  "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  *See* 42 U.S.C. §§ 6903(3); 9601(29)**.** As discussed in Section B of this opinion, PERC, a hazardous waste, did leak into the ground of the facility at issue and entered the environment.  Therefore, there has been a "disposal" as defined by the statute.

. . . of hazardous substances . . . by any other party or entity," when (and only when) "such person" "own[s] or possess[es]" the hazardous substances.  Borg-Warner's construction mandates  that the arranger owned or possessed the substance and that the arranger not have performed the disposal or treatment itself.  *See Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1080 (9th Cir. 2006).  According to the Ninth Circuit, this construction apparently requires deletion of the two commas that offset "by any other party or entity."  *Id.*

Borg-Warner argues that the statute is unambiguous and thus the Court's "efforts to construe or interpret the statute are unnecessary or inappropriate."[95]  But court after court has observed how CERCLA is a statute rife with ambiguities.[96]  Even a cursory examination reveals how Congress's grouping of phrases and clauses renders Section 107(a)(3) susceptible to differing interpretations.  In the face of such ambiguity, "[Section 107(a)(3)] must be given a liberal judicial interpretation consistent with CERCLA's overwhelmingly remedial statutory scheme."[97]

Many courts have ruled that a CERCLA arranger need not have owned or possessed the hazardous substance at issue, but none of these courts' rulings analyzed the statutory construction issue.[98]  Other courts have more recently ruled just the opposite, but again without firmly addressing

---

[95] Defs.' Post-Trial Br. at 6 (Docket No. 326) (citing *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

[96] *See, e.g., Gen. Battery*, 423 F.3d at 298 (quoting *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986)) ("CERCLA is not . . . 'a model of legislative draftsmanship'");*Uniroyal Chem. Co.*, 160 F.3d at 246; *Artesian Water Co. v. Gov't of New Castle County*, 851 F.2d 643, 648 (3d. Cir. 1988) ("*Artesian II*") ("CERCLA is not a paradigm of clarity or precision.  It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage."); *United States v. Mottolo*, 605 F. Supp. 898, 902 (D.N.H. 1985) ("*Mottolo II*") ("CERCLA has acquired a well-deserved notoriety for vaguely-drafted provisions").

[97] *Pakootas,* 452 F.3d at 1081 (internal quotes and ellipses omitted).

[98] *See, e.g., Cadillac Fairview / Calif., Inc. v. United States*, 41 F.3d 562, 565 (9th Cir. 1994); *Aceto*, 872 F.2d at 1381–82 (holding that CERCLA's statutory scheme makes "authority to control" handling and disposal critical, but not squarely addressing the ownership or possession requirement issue); *NEPACCO*, 810 F.2d at 743 (holding that

the underlying statutory construction issue.[99]

Two decisions directly address this particular issue of statutory construction.  In *American Cyanamid Co. v. Capuano*, the First Circuit stated that "[t]he sentence structure of § 9607(a)(3) makes it clear that" the section requires the arranger to have owned or possessed the hazardous substance.  381 F.3d 6, 24 (1st Cir. 2004) ("The clause 'by any other party or entity' clarifies that, for arranger liability to attach, the disposal or treatment must be performed by another party or entity . . . .").  The Rhode Island District Court concluded that the appellants—a group of waste hauling companies that had contracted with other companies to pick up, haul, and dump waste on a farm—were arrangers because their conduct "constituted active participation as a broker in the disposal of their customer's waste."  *Id.* at 10, 23.  The First Circuit rejected the appellees' argument that CERCLA arrangers need not have owned or possessed the hazardous substance and distinguished cases involving officers of hazardous-waste-generating corporations who controlled waste-disposal decisions and who sought to avoid liability by arguing they did not personally own or possess the waste.  *Id.* at 24.  The First Circuit nevertheless affirmed the district court's judgment, holding that the appellants were "brokers" who had constructive possession based on their control

requiring proof of personal ownership or physical possession as a precondition for liability frustrates CERCLA's broad remedial purposes); *United States v. Union Corp.*, 259 F. Supp. 2d 356, 393 (E.D. Pa. 2003) (citing *Aceto*); *United States v. Mottolo*, 629 F. Supp. 56, 60 (D.N.H. 1984) ("*Mottolo I*") (holding that Section 107(a)(3) "clearly states" that arrangers "need not own or possess the waste"); *R.R. Street II.*, 166 S.W.3d at 242 (citing *Union Corp.*).

[99] *See Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1219 (10th Cir. 2003) (holding without discussion that a CERCLA arranger "must 'own' or 'possess' the hazardous substance at issue); *Morton Int'l*, 343 F.3d at 677 (holding that "ownership or possession of the hazardous substance must be demonstrated, but . . . alone will not suffice to establish [arranger] liability"); *BP Amoco Chem. Co. v. Sun Oil Co.*, 316 F. Supp. 2d 166, 172 (D. Del. 2004) (applying *Morton Int'l*); *Shell Oil Co.*, 294 F.3d at 1058 (holding that ownership or possession *or* "actual control" is needed); *Sea Lion, Inc. v. Wall Chem. Corp.*, 974 F. Supp. 589, 596 n.12, 598 (S.D. Tex. 1996) (indicating but not directly holding that the arranger need not have owned or possessed the substance); *United States v. Iron Mountain Mines, Inc.*, 881 F. Supp. 1432, 1451 (E.D. Cal. 1995) ("*Iron Mountain I*") (holding that an arranger must have owned or possessed *or* had the "authority to control or duty to dispose of [] the hazardous materials at issue").

over the waste and could not escape liability by claiming they were essentially middlemen.  *Id.* at 25.  The First Circuit refused to read "ownership or possession" to support a loophole permitting such an escape.  *Id.*

In *Pakootas*, the appellants sought to enforce the EPA's order that the appellees conduct a study of a site where the appellees' waste came to be located.  452 F.3d at 1069.  The EPA found that appellees arranged for the waste's disposal.  *Id.*  Relying on dicta from a previous Ninth Circuit case to support the same construction of Section 107(a)(3) that Borg-Warner now proposes, the appellees argued that because they disposed of the waste themselves, they could not have "'arranged for disposal' of a hazardous substance 'by *any other* party or entity.'"  *Id.* at 1075 (emphasis added); *see id.* at 1081–82.  The Ninth Circuit rejected the construction because it "would create a gaping and illogical hole" in "CERCLA['s] liability regime by allowing a generator of hazardous substances potentially to avoid liability by disposing of wastes without involving a transporter as an intermediary."  *Id.* at 1081.

Though the statute's facial ambiguity makes this question a close one, the thrust of these decisions, taken in tandem with the general overriding purposes of CERCLA, convinces the Court that Borg-Warner need not have actually owned or possessed the PERC to be held liable as an arranger.  The Court should "not interpret section 9607(a) in any way that apparently frustrates the statute's goals, in absence of a specific congressional intent otherwise."[100]  "'Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and

---

[100] *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir. 1985) ("*Shore Realty I*"); *see* 82 C.J.S. *Statutes* § 314 ("[T]he foremost obligation or primary duty of a court in interpreting a statute is to ascertain and give effect to the intention and purpose of the legislature.").

responsibility for remedying the harmful conditions they created."[101]  Federal courts have developed a sophisticated case-by-case approach to fulfill this purpose by ensuring that only those parties with a sufficient connection or "nexus" to the transaction at issue are found to have "arranged for disposal or treatment" of hazardous substances. *See Geraghty & Miller*, 234 F.3d at 929; *N.J. Turnpike Auth.*, 197 F.3d at 105; *Gen. Elec. Co.*, 962 F.2d at 286.  Moreover, a defendant's actual ownership or possession of a hazardous substance may be a distinct factor in the nexus analysis.  *See Vine Street I*, 361 F. Supp. 2d at 606;  *Sea Lion*, 974 F. Supp. at 595.  Therefore, the PERC may be owned by the defendant *or* some other party or entity.

In the present case, James Keeling's unrebutted testimony demonstrates that Norge supplied the initial PERC disbursed by its dry-cleaning machines.  In addition, James Keeling and David Bart Keeling, Jr. further testified that Polk Oil Company employee Sonny Lunsford regularly delivered College Cleaners its PERC supply, after the initial supply it received, via truck through a hose attachment.  Borg-Warner did not attempt to rebut this evidence.  Evidently, either Lunsford or Polk Oil Company must have had in their actual or constructive possession the PERC that was delivered to College Cleaners.  This establishes that a person or entity other than Borg-Warner possessed the PERC that Vine Street claims was disposed of at the facilities.

It was Norge's machine that served as the vehicle for the distribution of PERC into the ground, and Norge exerted substantial control over the means and manner of the PERC's disposal through its franchise-like operation of the dry cleaning facility.  While Norge may not have been the only arranger in the process, it is certainly an arranger under the Court's reading of the statute.

---

[101] *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986) (quoting *United States v. Reilly Tar & Chem. Corp.*, 546 F.Supp. 1100, 1112 (D. Minn. 1982)).

*4. Conclusion*

Borg-Warner is a person who arranged for the disposal of PERC owned or possessed by another party at the West Glenwood laundromat building.  Therefore, Borg-Warner is an arranger and a responsible party under CERCLA Section 107(a)(3).  Fedders, though a "person" in the technical sense, is not an arranger because it is not a successor-in-interest that assumed Borg-Warner's liabilities.  Because Vine Street did not allege any other basis to hold Fedders responsible for the contamination, Fedders is not a responsible party.

F.      Conclusion

Because (1) the West Glenwood laundromat building and property on which it sits are facilities, (2) there was a release of a hazardous substance from the West Glenwood property, (3) the release caused Vine Street to incur necessary costs of response, and (4) Borg-Warner is a responsible party with respect to the facilities, the Court concludes that Borg-Warner is liable to Vine Street under CERCLA for the necessary response costs that Vine Street incurred consistent with the NCP.  Because Fedders is not a responsible party, the Court concludes that Fedders is not liable to Vine Street under CERCLA.

**SWDA Liability**

The SWDA is the Texas solid waste counterpart to CERCLA.  *R.R. Street II*, 166 S.W.3d at 238; TEX. HEALTH & SAFETY CODE §§ 361.001 et seq.  The SWDA's cost-recovery provisions are structured similarly to CERCLA's and are interpreted in a similarly liberal manner to give effect to the SWDA's remedial purposes.  *R.R. Street II,* 166 S.W.3d at 238; *see also Vine Street I*, 361 F. Supp. 2d at 605.

To establish a prima facie case of SWDA liability, Vine Street must show that: (1) the

Defendant is a "person responsible for solid waste" as defined in THSC § 361.271; (2) Vine Street "conducts a removal or remedial action" approved by the TCEQ; (3) the removal or remedial action is "necessary to address a release or threatened release" of solid waste; (4) the costs of the action were "reasonable and necessary"; and (5) Vine Street made "reasonable attempts to notify the [D]efendant . . . of the existence of the release" and "intended to take steps to eliminate the release."[102] TEX. HEALTH & SAFETY CODE § 361.344; *see RR Street II*, 166 S.W.3d at 240.

Because of the substantially similar wording in the SWDA and CERCLA, the Court presumes, absent contrary indication, that the Texas Legislature intended to adopt the construction placed on the wording by federal courts. *R.R. Street I*, 81 S.W.3d at 290 (citing *Blackmon v. Hansen*, 169 S.W.2d 962, 964–65 (Tex. 1943)). Because Texas law is lacking in cases discussing the scope of arranger liability under the SWDA, Texas courts look to federal case law interpreting CERCLA for guidance in determining that scope. *See id.*; *R.R. Street II*, 166 S.W.3d at 241. Therefore, where the SWDA and CERCLA language is the same, the Court applies its interpretation regarding the CERCLA provision to the SWDA provision at issue.

Texas rules of decision bind this Court's interpretations of substantive Texas law.[103] Thus, this Court is obligated to rule as the Texas Supreme Court would rule.[104]

A. Borg-Warner is a person responsible for solid waste, Fedders is not

Vine Street alleges that Borg-Warner and Fedders are "persons responsible for solid waste"

---

[102] Defendants did not plead or argue any SWDA defenses. *See* TEX. HEALTH & SAFETY CODE § 361.275.

[103] *Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407, 409 n.1 (5th Cir. 2006); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state").

[104] *First Nat'l Bank of Durant v. Trans Terra Corp.*, 142 F.3d 802, 806 (5th Cir. 1998) (internal quotations and footnote omitted).

because those Defendants "arranged for the disposal of solid waste at College Cleaners."[105]   The SWDA's "arranger status" provision is very similar to CERCLA's "arranger status" language.  *R.R. Street II*, 166 S.W.3d at 241.   Under the SWDA, an "arranger" is a "person . . . (3) [who] by contract, agreement, or otherwise arranged to process, store, or dispose of . . . solid waste owned or possessed by the person, by any other person or entity at . . . (A) the solid waste facility owned or operated by another person or entity that contains the solid waste . . . ."  TEX. HEALTH & SAFETY CODE § 361.271(a)(3).

### 1. Person who by contract, agreement or otherwise

The SWDA defines "person" almost identically to CERCLA, and the Court has already determined that Defendants are persons as defined by CERCLA.   The language "by contract, agreement, or otherwise" is identical to CERCLA, and Texas courts have not squarely addressed this particular term.   Therefore, the Court's reasoning regarding successor liability is equally applicable to the SWDA, and Fedders is not liable under the SWDA as an arranger.

### 2. Arranged . . . to dispose

Both the Texas Supreme Court in *R.R. Street II* and the First Court of Appeals in *R.R. Street I* dedicated a substantial portions of their respective opinions to the issue of whether the defendant's actions constituted "arrange[ment] for disposal" of PERC.   Those courts found the defendant had not arranged for disposal because the defendant did not exercise sufficient "actual control" over the decision regarding the specific method or manner of disposal.  *R.R. Street II*, 166 S.W.3d at 246. The plaintiff in Street was free to ignore the defendant's advice. *Id.*

As discussed in the application of CERCLA's "arranged for disposal" requirement, Norge's

---

[105]  Vine St.'s Compl. at ¶ 52 (Docket No. 240 at 12).

level of input into and control of the facility's design and layout, its workers' installation and testing of the facility's equipment, its corporate representatives' degree of participation in the facility's opening, its training of the facility's attendants, its requirements for displays of signs, colors, and logos, and College Cleaners' own identification of the facility as a "Norge Laundry & Cleaning Village"—a term which Norge itself seems to have accorded specific meaning—indicate that College Cleaners and Norge had a franchise or franchise-like agreement.

Unlike the plaintiff in *R.R. Street*, given Norge's substantial involvement in the design of its franchise and the machines' actual installation, College Cleaners had no practical choice as to how to dispose of the wastewater.  Flushing the wastewater to the sewer was not a recommendation or advice, but rather an integral part of Norge's design for the dry-cleaning system and the dry-cleaning facility.  Norge's activities here demonstrate that it had the authority to and did exercise actual control over the specific method and manner of the PERC's disposal.  Norge was actually involved in deciding how to dispose of that wastewater and the PERC contained therein.  Therefore, Norge (and thus Borg-Warner) arranged for the disposal of the PERC.

### 3. *Owned or possessed by the person, by any other party or entity*

The SWDA's version of this element is worded exactly like CERCLA's version.  However, unlike in the case of CERCLA, here there exists authoritative precedent resolving the element's construction.  Looking to federal CERCLA case law for standards to determine the SWDA arranger status, the Texas Supreme Court held that "[w]hile ownership or possession [by the arranger] of the hazardous substance is a factor, it is not a prerequisite for arranger status."  *R.R. Street II*, 166 S.W.3d at 242 (citing *Union Corp.*, 259 F. Supp. 2d at 393 (citing *Aceto*, 872 F.2d at 1381–82)).  Such a pronouncement is authoritative.  *See United States v. Johnson*, 160 F.3d 1061,1063 (5th Cir.

1998) (state supreme court pronouncements on issues of substantive state laws control federal court decisions on such laws). Therefore, under the SWDA Vine Street need only have established that some entity owned or possessed the PERC. Vine Street has already established that Sonny Lunsford, the deliveryman for College Cleaners's PERC supplier, possessed the PERC in the course of delivering the substance. Accordingly, Vine Street has shown that some definitive person or entity possessed the PERC used in the machines.

#### 4.   Solid waste facility owned or operated by another party or entity

The term "solid waste facility" includes "all land, including structures, appurtenances, and other improvements on the land, used for . . . disposing of solid waste." TEX. HEALTH & SAFETY CODE § 361.003(36). The one Texas case addressing the term's definition did not give it any remarkable attention, and the statute does not indicate that word "used" connotes any particular method of operation or departure from the word's plain meaning. *See Seaway Prods. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 656 (Tex. App.—Ft. Worth 2004, no pet.) (reciting, but declining to analyze, the definition of "solid waste facility"). Disposal of the PERC occurred on and in the West Glenwood property and within the laundromat building. The property and building were used for the PERC's disposal and thus are solid waste facilities.

Likewise, it is undisputed that the Roosth and Genecov families owned the West Glenwood property and laundromat building during the period in question, and it is undisputed that College Cleaners operated the laundromat. Neither of these parties are the Defendants; therefore, the facility was "owned or operated by another person or entity." In addition, the Court has already determined that the properties at issue contained PERC. Therefore, if PERC is a "solid waste," the last element of arranger liability is satisfied.

### 5.  Solid waste and the "domestic sewage exclusion"

Since the other elements are met, if the PERC is "solid waste," then Borg-Warner is a person responsible for solid waste.  The SWDA requires that the substance at issue be "solid waste" as opposed to a "hazardous substance" as required by CERCLA.  However, the SWDA's definition of solid waste includes the term "hazardous substances."[106]  Since the EPA lists perchloroethylene and trichloroethylene as hazardous air pollutants pursuant to Federal Clean Air Act (42 U.S.C. § 7412), they are hazardous substances for the SWDA's purposes.  *See* Tex. Health & Safety Code § 361.003(11)(A)(v); 40 C.F.R. § 61.01.  The EPA identifies tetrachloroethylene as a toxic pollutant under the Federal Water Pollution Control Act (33 U.S.C. 1317(a)), making it a "hazardous substance" under the SWDA as well.  *See* Tex. Health & Safety Code § 361.003(11)(A)(iv); 40 C.F.R. § 401.15.  Therefore, the PERC at issue in this case is a "solid waste" for purposes of the SWDA's arranger liability, *provided* that none of PERC falls under the SWDA's statutory or regulatory domestic sewage exclusion.[107]  Tex. Health & Safety Code § 361.003(34)(A)(i); 42

---

[106] The statute provides:

> Subject to the limitations of 42 U.S.C. Section 6903(27) and 40 C.F.R. Section 261.4(a), "solid waste" means garbage, rubbish, refuse . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from . . . commercial operations and from community and institutional activities.  The term . . . (A) does not include . . . (i) solid or dissolved material in domestic sewage . . . ; and (B) **does include hazardous substances**, for the purposes of Sections 361.271 through 361.277, 361.280, and 361.343 through 361.345.

Tex. Health & Safety Code § 361.003(34)(emphasis added)

[107]      The SWDA's domestic sewage exclusion is grounded in the provisions and regulations made in pursuance of the Resource Conservation and Recovery Act ("RCRA"), a statute that complements CERCLA, but is nonetheless "'designed primarily to regulate on-going treatment, storage, and disposal of *solid wastes*,'" as opposed to the hazardous substances with which CERCLA is concerned.  *R.R. Street II*, 166 S.W.3d at 238, 248 (quoting *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1201 (2d Cir. 1992) (emphasis supplied)).

U.S.C. § 6903(27); 40 C.F.R. § 261.4; *see also R.R. Street II*, 166 S.W.3d at 247–48. [108]

The SWDA's statutory "domestic sewage exclusion," found in 42 U.S.C. § 6903(27) and THSC § 361.003(34)(A)(i), excludes "solid or dissolved material in domestic sewage" from the definition of "solid waste." *See* 42 U.S.C. § 6903(27); TEX. HEALTH & SAFETY CODE § 361.003(34)(A)(I); *see also R.R. Street II*, 166 S.W.3d at 247. The broader "regulatory" exclusion of 40 C.F.R. § 261.4 excludes both "domestic sewage"—defined as "untreated sanitary wastes that passes through a sewer system"—and "any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment" from the definition of "solid waste." 40 C.F.R.§ 261.4(a)(1).

Although not expressly required by the SWDA, courts have read "domestic sewage" under the statutory exclusion to mean "residential sewage." *R.R. Street II*, 166 S.W.3d at 249; *see also PRASA II*, 888 F.2d at 184–86. Under the broader regulatory exclusion of "domestic sewage," however, the argument that PERC is "domestic sewage" also fails. Because the PERC at issue leaked into the soil at the laundromat's property, it leaked into the ground before it reached a publicly-owned treatment works facility and before it mixed with any residential sewage downstream. The Defendant in *R.R. Street II* cited an EPA order to support its argument that the regulatory domestic sewage exclusion applied as soon as the PERC entered a sewer system that would eventually mix with domestic sewage, regardless of whether the waste leaked from the sewer line before it actually mixed. *R.R. Street II*, 166 S.W.3d at 250. The Texas Supreme Court rejected

---

[108] *See* 42 U.S.C. § 6903(27) (excluding "solid or dissolved material in domestic sewage"); TEX. HEALTH & SAFETY CODE § 361.003(34)(A)(i)(same); 40 C.F.R. § 261.4 (excluding both "domestic sewage"—"untreated sanitary wastes that pass through a public sewer system"—and "any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned works for treatment"); *R.R. Street II*, 166 S.W.3d at 247–48.

this argument stating that because PERC leaked into the ground prior to mixing with domestic sewage, it would fall outside the RCRA and the Clean Water Act and would frustrate the statutes' purposes.[109]   Similarly, to allow a defendant to escape liability under the SWDA by claiming a domestic sewage exclusion and escape liability under RCRA because the sewage at issue never actually reached a publicly owned treatment works frustrates the SWDA's purpose, and therefore cannot be the proper construction.[110]   Because the PERC at issue leaked into the ground prior to mixing with domestic sewage and prior to reaching a publicly owned treatment works facility, the Court holds that the domestic sewage exclusion is inapplicable in this case and the PERC at issue is a "solid waste" for the SWDA purposes.

Accordingly, Borg-Warner is a person responsible for solid waste under the SWDA.

B.   Vine Street is conducting a "removal action" that was approved by the TCEQ

1.   Removal or remedial action

The Court has already found that Vine Street's actions were necessary to monitor, assess, and evaluate the release of the PERC and thus constitute a removal action under CERCLA.  Properly construed, the SWDA's definition of "removal action" is substantively identical to CERCLA's definition.  Therefore Vine Street's actions constitute a removal action under the SWDA.

2.   Approval by TCEQ

The SWDA adds the requirement that Vine Street show the TCEQ approved its  removal

---

[109] See id. citing Lincoln Props., Inc. v. Higgins, 1993 WL 217429, at *1 ("The Clean Water Act . . . establishes pretreatment standards for discharges into a 'publicly owned treatment works'; it does not apply to contaminants that are discharged into groundwater and never reach a 'treatment works.'")

[110] See id.; Lincoln, 1993 WL 217429, at *12 ("Even if the Subtitle C regulations did apply generally, they would not govern the contaminants in question, which escaped into the soil and groundwater and never reached "a publicly-owned treatment works.")

actions.  The First Court of Appeals has noted that the SWDA does not define or specify the mechanics of "approval."  *R.R. Street I*, 81 S.W.3d at 299.[111]  However, "[i]n keeping with the remedial purposes of [the] SWDA," the First Court of Appeals found that evidence of the plaintiff's entry into an agreement with the TCEQ under the Texas Voluntary Cleanup Program ("VCP") and the TCEQ's approval of the plaintiff's "closure plan" for each of the contaminated sites established the element of "approval" as a matter of law.  *Id.*

In this case, Borg-Warner does not dispute that Vine Street entered into an agreement with the TCEQ to participate in the Texas VCP, pursuant to THSC §§ 361.601, et seq.[112]  The terms of the agreement require Vine Street to submit various periodic reports. The TCEQ engaged in numerous correspondences with Steven Roosth and his environmental consultants and the correspondences indicate that the TCEQ discussed with Roosth and the consultants numerous aspects of the contamination, its monitoring and evaluation, and the work plan for eventual cleanup.[113]  As early as September 2002, the TCEQ requested Vine Street initiate an extensive monitoring program, drill additional wells, and take continuing soil and groundwater samples

---

[111]

When it reversed the First Court of Appeals' judgment in part and remanded the plaintiff's SWDA claim for a new trial on the question of "arranger" status, the Texas Supreme Court in *R.R. Street II* declined to address whether the Court of Appeals erred in finding that the plaintiff proved the remaining elements of the defendant's liability as a matter of law.  *See* 166 S.W.3d at 253, 255.  The Texas Supreme Court gave no indication that it would reverse the Court of Appeals's findings on the remaining elements of SWDA liability.  As a result, those undisturbed findings remain the Texas courts' only pronouncement on these remaining elements and thus the best indicator of what the Texas Supreme Court would decide.  *See Transcon. Gas v. Transport. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992) (holding that a federal court, in absence of a state supreme court pronouncement on a subject of state substantive law, must "determine as best it can[ ] what the highest court of the state would decide").  Those findings—to the extent they are relevant—bind the Court unless the Court is "convinced by other persuasive data" that the Texas Supreme Court would decide otherwise.  *First Nat'l Bank of Durant v. Trans Terr Corp.*, 142 F.3d 802, 809 (5th Cir. 1998) (internal quotations and footnote omitted).

[112] *See* Vine Street Exhibit 5 at 20–24; Vine Street Exhibit 7 at 27.

[113] *See* Vine Street Exhibit 7 at 28–30; Vine Street Exhibit 38 at 001513–001574.

through deep-ground "push rod" investigations designed to minimize the amount of dirt and waste generated from the monitoring process.[114]   The removal action has been an evolving process characterized by several stages of work, plan submissions and proposals, TCEQ comments thereon, and revisions in accordance with those comments.[115]   From all indications, the TCEQ thus far has approved the steps Vine Street has taken to clean up the West Glenwood and South Vine properties. Because Vine Street has shown that it engaged in a removal action approved by the TCEQ, it has established this element of Borg-Warner's liability.

C.   The removal action was "necessary to address the release" of solid waste

The First Court of Appeals addressed this element solely by determining whether the plaintiff established the existence of a "release" of solid waste.  *See R.R. Street I*, 81 S.W.3d at 299.  The SWDA's definition of "release" is substantively identical to CERCLA's definition.  *See* TEX. HEALTH & SAFETY CODE § 361.003(28).  The court of appeals found that the plaintiff fulfilled this element as a matter of law by tendering undisputed evidence showing PERC contamination of the soil and groundwater at plaintiff's sites.  *R.R. Street I*, 81 S.W.3d at 299.  As discussed with respect to CERCLA, Vine Street has shown the same undisputed evidence in this case, for both the West Glenwood and South Vine properties.  Thus, Vine Street has shown there was a "release," and this element is satisfied.

D.   The costs of the action were "reasonable and necessary"

An SWDA plaintiff demonstrates its costs of response are "reasonable and necessary" by showing that the costs are incurred in response to a threat to health or the environment and are

---

[114] Mar. 20, 2006 Trial Testimony of Steven Roosth; Vine Street Exhibit 7 at 28–30.

[115] *See generally* Vine Street Exhibit 38 at 001513–001574.

necessary to address that threat.  *R.R. Street I*, 81 S.W.3d at 301 (citing *G.J. Leasing*, 854 F. Supp. at 561).  This standard is substantially similar to the standard courts use for "necessary costs of response" under CERCLA, and the court of appeals in *R.R. Street I* noted that its standard was based on federal cases interpreting CERCLA.  *Id.* at 300.  Like in *R.R. Street I*, here it is undisputed that Vine Street's costs associated with its removal actions are being incurred in response to the soil and groundwater contamination.  *See id.* at 302.  As discussed with respect to CERCLA, Vine Street has demonstrated that the costs of the action were "reasonable and necessary."  Defendants offered no evidence to indicate that these activities were unreasonable or unnecessary.  Therefore, Vine Street has established this element of Borg-Warner's liability.

E.  Vine Street made "reasonable attempts to notify" Borg-Warner of "the existence of the release" and that Vine Street "intended to take steps to eliminate the release"

The First Court of Appeals found that Pilgrim established this element as a matter of law through its former president's undisputed testimony that he notified R.R. Street about the contamination and requested R.R. Street participate in the cleanup.  *R.R. Street I*, 81 S.W.3d at 302–03.  In this case, Vine Street introduced in evidence copies of letters it sent to Borg-Warner Morse Tec, Inc.[116] in March 2004, notifying it of the existence of the PERC's release and that Vine Street was taking steps to eliminate the release.[117]  Borg-Warner does not dispute that Vine Street made such notifications.  Therefore, Vine Street has established this element of Borg-Warner's

---

[116]  Vine Street originally filed suit against Borg Warner Morse Tec, Inc.  Pursuant to this Court's August 10, 2004 Order (Docket No. 130), Borg Warner Morse Tec, Inc. was dropped as a party to the case after identifying Borg-Warner Corporation as the correct defendant, (*see* Docket No. 131), whom Vine Street then joined.  To the extent Vine Street did not succeed in notifying Borg-Warner of the PERC's release in March 2004, the Court finds that Vine Street's March 2004 letter to Borg Warner Morse Tec, Inc. combined with its subsequent joining of Borg-Warner suffice as reasonable attempts to notify Borg-Warner of the release and Vine Street's intent to eliminate the release.

[117]  *See* Vine Street Exhibit 102.

43

liability.

F. <u>Conclusion</u>

Because Vine Street has established that (1) Borg-Warner is a "person responsible for solid waste" as defined in THSC § 361.271; (2) Vine Street conducted a removal or remedial action approved by the TCEQ; (3) the removal or remedial action was "necessary to address a release or threatened release" of solid waste; (4) the costs of the action were "reasonable and necessary"; and (5) Vine Street made "reasonable attempts to notify [Borg-Warner] . . . of the existence of the release" and "intended to take steps to eliminate the release," Vine Street has established Borg-Warner's liability under the SWDA.

<b>RELIEF</b>

Vine Street seeks (1) recovery of response costs under CERCLA and the SWDA, (2) a declaration of Defendants' responsibility for future response costs Vine Street incurs in monitoring and cleaning up the contamination, (3) attorneys' fees and expenses incurred in litigating this suit, and (4) all other costs and expenses of suit, including pre-judgment and post-judgment interest at the highest rates permitted by applicable law.  Only Borg-Warner is liable to Vine Street.

**Response Costs**

A.   <u>Preemption of the SWDA</u>

Although CERCLA provides that it is not to "be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State," the statute also precludes (1) "any person who receives compensation for removal costs or damages or claims pursuant to [the statute ] . . . from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law," and

44

(2) "any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law . . . from receiving compensation for the same removal costs or damages or claims as provided in [CERCLA]."  42 U.S.C. § 9614(a), (b).

CERCLA Section 114(a) purports not to preempt state law, but Section 114(b) makes clear that a CERCLA plaintiff cannot recover the same response costs twice.[118]  Very few courts have addressed this exact issue of overlapping recovery under CERCLA and a comparable state provision; however, it is evident that to the extent that CERCLA and the SWDA entitle Vine Street to recover the same response costs, the Court must deny Vine Street recovery under one of the statutes. There is an actual conflict between the two statutes because each law provides that Vine Street is entitled to recover costs that, under Section 114(b), can only be awarded once.  The Court cannot comply with Section 114(b) if it allows Vine Street to recover its costs of maintaining the removal action under the SWDA.  For all intents and purposes, Vine Street's recovery of response costs under CERCLA subsumes Vine Street's recovery under the SWDA of removal-action-maintenance costs. *See Andritz Sprout-Bauer*, 174 F.R.D. at 628.

Accordingly, although the Court recognizes Borg-Warner's liability under the SWDA, CERCLA preempts Vine Street's right to recover under the SWDA.

B. Nature of recovery under CERCLA

Vine Street's post-trial invoices catalogue the expenditures Vine Street claims are recoverable response costs.  *See generally* Vine St. Exhibit 103.  The Court deems these updated invoices, totaling $574,576.28, to represent Vine Street's cumulative expenses from August 23,

---

[118] *See Bedford Affiliates*, 156 F.3d at 426; *New York v. Hickey's Carting, Inc.*, 380 F. Supp. 2d 108, 114–15 (E.D.N.Y. 2005); *Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 628 (M.D. Pa. 1997).

2001, the date Vine Street incurred its first response cost, through March 31, 2006.

This Court has already determined that Vine Street cannot state a claim for relief under CERCLA Section 113, but can bring an implied right of contribution claim under Section 107(a)(4)(B).  *Vine Street II*, 362 F. Supp. 2d at 763.  A contribution claim allows a plaintiff to obtain several-only recovery, as opposed to joint and several recovery, of response costs that exceed the plaintiff's own equitable share.  *Elementis Chromium L.P. v. Coastal States Petroleum Co.*, 450 F.3d 607, 613 (5th Cir. 2006); *Seneca Meadows*, *Inc. v. ECI Liquidating*, *Inc.*, 427 F. Supp. 2d 279, 289 (W.D.N.Y. 2006).

C. Expenditures that are not response costs—litigation-related attorneys' and experts' fees

Although Vine Street is entitled to recover CERCLA response costs from Borg-Warner, Vine Street is not entitled to recover the expenditures listed on the invoices that do not qualify as response costs.  The Court has already determined that Vine Street cannot recover economic damages, including lost rentals and the West Glenwood and South Vine properties' diminution in value, litigation-related attorneys' fees and the experts' fees of Craig Chelsey, Richard Fortuna, Bruce Dale, and Richard Levine.[119]  Vine Street has presented no evidence or arguments that dissuade the Court from applying its earlier analysis and ruling to Borg-Warner's liability.  Further, because Vine Street has submitted no evidence and made no argument that experts Dr. Alan Eggleston's and Aaron Weegar's work was closely related to Vine Street's cleanup efforts, on which the Court denied summary judgment, Vine Street has not proven that Eggleston's and Weegar's fees are CERCLA response costs.  Therefore, Vine Street may not recover these experts' fees.

---

[119] Docket No. 230. Although the Court's ealier ruling was in response to Maytag and Fedders's motion for summary judgment (Docket No. 211), the law and analysis are equally applicable here.

Finally, Vine Street's invoices include charges from O'Brien's and Krasnoff's consulting companies. Vine Street has submitted no evidence and made no argument that these charges correspond to work closely related to Vine Street's cleanup activities.[120] Therefore, Vine Street may not recover these experts' fees.

Accordingly, the Court deducts $400,793.61 as unrecoverable fees from the $574,576.28 that Vine Street contends are its total response costs through March 31, 2006.[121] Vine Street has claimed $173,782.67 in what can be properly termed CERCLA response costs through March 31, 2006.

D. Consistency with the NCP

CERCLA requires that a private plaintiff's response costs be consistent with the NCP "to the greatest extent possible." *See* 42 U.S.C. §§ 9601(31), 9605, 9607(a)(4)(B); 40 C.F.R. §§ 300, et seq. This is not an element of CERCLA liability, but a factual issue affecting which response costs Vine Street may recover. *See Amoco Oil*, 889 F.2d at 668.

Borg-Warner argues that Vine Street may not recover any response costs because it failed to prove its actions were "substantially consistent" with the NCP. Borg-Warner argues that though the specific requirements differ depending on whether a CERCLA claimant engages in a removal or remedial action, the NCP requires that the claimant permit substantial public comment and

---

[120] The evidence Vine Street has submitted indicates that these experts' work was definitively litigation-related. For example, a January 2006 invoice from O'Brien's firm for $12,561.69 describes O'Brien's work to include such activities as "[r]eview expert report and develop scope of demonstratives" and "[c]ontinue preparation of demonstrative exhibits, compile litigation matters over past 4-5 years, transmit information to [counsel for Vine Street]." Vine St. Exhibit 103. Likewise, a January 2006 invoice from Krasnoff's firm for $7,862.28 lists all charges as falling under the category of "Litigation Support" and describes such activities as Krasnoff's "preparation of demonstratives" and his subordinates' work in "document production." *Id.*

[121] Vine St. Exhibit 103. This includes fees from Strategic Environmental Analysis and from Bruce Dale (which the Court ruled in August 2005 that Vine Street generally could not recover) totaling $9,851.93 and $10,000.00, respectively, from Eggleston's firm totaling $138,907.81, from Weegar's firm totaling $153,368.83, from O'Brien's firm totaling $34,842.16, and from Krasnoff's firm totaling $53,822.88.

participation before the claimant may recover response costs.  Borg-Warner also argues that a

CERCLA claimant may recover response costs only if it has actually conducted a CERCLA-quality

cleanup and that mere testing, monitoring, and assessment of a contaminated site are insufficient to

allow recovery.[122]  Borg-Warner is wrong in both of its arguments.

The type of preliminary investigatory and monitoring costs Vine Street has incurred are

recoverable irrespective of the NCP's public participation requirements.[123]  "'[T]he detailed NCP

provisions governing other response actions cannot reasonably be applied to preliminary monitoring

and evaluation of a release of hazardous substances.'"[124]  All of Borg-Warner's cited cases dealt

either with remedial actions or with removal activities other than or, in addition to, the type of

monitoring and evaluation activities at issue here.[125]  Those cases are distinguishable, and Borg-

---

[122] A CERCLA-quality cleanup (1) has a remedy "protective of human health and the environment"; (2) utilizes "permanent solutions and alternative treatment technologies or resource recovery technologies"; (3) is cost-effective; and (4) is selected after "meaningful public participation."  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1160 (C.D. Cal 2003) ("*Carson Harbor II*") (quoting 55 Fed.Reg. 8793).

[123] *See, e.g.*, 40 C.F.R. §§ 300.415(a), (n) (in public-agency-conducted removal actions, requiring the "lead agency" to designate a spokesperson to inform the community of actions taken and respond to inquiries, as well as publication of and allowance for public comment on an "engineering evaluation / cost analysis"), 300.430(c), (f) (requiring interviewing and community relations plans "prior to commencing field work for the remedial investigation," and presentation of proposed plans to the public as "the first step in the remedy selection process"), 300.435(c) (community relations requirements in the context of remedial design and remedial action, operation, and maintenance of the selected remedy); *see also Donahey v. Bogle*, 987 F.2d 1250, 1255–56 (6th Cir. 1993), *judgment ultimately reaffirmed*, 16 Fed. Appx. 283, 2000 WL 977376 *1 (6th Cir. 2000) (en banc); *VME Ams., Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 693 (E.D. Wis. 1996); *City of New York v. Chem. Waste Disposal Corp.*, 836 F. Supp. 968, 980 (E.D.N.Y. 1993); *Marriott*, 825 F. Supp. at 1583; *Gache v. Town of Harrison*, 813 F. Supp. 1037, 1046 (S.D.N.Y. 1993); *Carlyle Piermont Corp. v. Fed. Paper Bd. Co.*, 742 F. Supp. 814, 821 (S.D.N.Y. 1990); *Artesian Water Co. v. Gov't of New Castle County*, 659 F. Supp. 1269, 1294 (D. Del. 1987) ("*Artesian I*"), *aff'd* 851 F.2d 643 (3d Cir. 1988).

[124] *Marriott*, 825 F. Supp. at 1583 (quoting *Artesian I*, 659 F. Supp. at 1294); *see also Amland Props. Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784, 795 (D.N.J. 1989).

[125] In addition, Defendants cite an unpublished Sixth Circuit case, *Pierson Sand & Gravel v. Pierson Twp.*, 98 F.3d 835 (table), 1996 WL 338624 (6th Cir. 1996), to for the proposition that "the NCP requires more than incidental opportunities for public comment."  Defs. Post-Trial Br. at 14 n.52.  However, that very same decision held that "'initial' [and] 'preliminary' investigative costs may be recovered despite failure to comply with the NCP.  Any costs incurred after a cleanup has begun are recoverable only if incurred consistent with the NCP."  *Pierson*, 1996 WL

Warner's arguments fail.  The NCP does not address the types of initial monitoring and investigatory costs Vine Street has incurred; thus Vine Street has complied with all "applicable requirements."

Borg-Warner also cites *Young v. United States*, 394 F.3d 858 (10th Cir. 2005) to argue that because a private party's response action must "result[] in a CERCLA-quality cleanup," Vine Street must engage in an actual cleanup before it may recover response costs.  *See* 40 C.F.R. § 300.700(c)(3)(i).  In *Young*, the plaintiffs had abandoned their contaminated property and repeatedly testified that they did not intend to spend any money to clean up the property.  394 F.3d at 861–62, 864.  The Tenth Circuit opined that plaintiffs' costs for initial investigation and monitoring "might be compensable if linked to an actual effort to contain or cleanup an actual or potential release of hazardous substances," but were not recoverable in this instance because they were incurred "solely for litigation."  *Id.* at 865.  In contrast, Roosth testified that Vine Street's costs are directly incident to Vine Street's planned cleanup activities.[126]  *Young* is therefore distinguishable on its facts.

Nothing in the NCP requires a CERCLA claimant to develop, implement, or obtain government approval for a more extensive removal or remedial action before being able to recover for investigatory and monitoring costs.  Denying private claimants recovery of these costs would discourage voluntary cleanup activities because such claimants would need to incur much more substantial costs before knowing for certain whether they are entitled to reimbursement.  Such a result is incompatible with Congress's desire to promote prompt cleanup of contaminated sites.  Accordingly, Vine Street has shown that its response costs through March 31, 2006 are "consistent with the [NCP]."

---

338624, at *6 (citing *County Line*, 933 F.2d at 1515).  Borg-Warner agrees no cleanup has yet begun.

[126] Mar. 20, 2006 Testimony of Steven Roosth.

E.  Equitable apportionment of necessary response costs

    *1. Methodology to determine shares of responsibility*

        a. Factors to be applied

A PRP seeking to recover response costs in a contribution action bears the burden of proof as to the equitable apportionment of response costs. *Elementis*, 450 F.3d at 612–13; *City of Bangor v. Citizens Comms. Co.*, 437 F. Supp. 2d 180, 212 (D. Me. 2006).  "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1); *see also Elementis*, 450 F.3d at 612.  Section 113(f)(1)'s language governing allocation of response costs among liable parties is not limited to contribution actions arising under Section 113(f)(1), but generically applies to "contribution claims."  42 U.S.C. § 9613(f)(1).  Allocating cleanup costs is done on a case-by-case analysis of the totality of the circumstances.[127]

The most relevant factors to the Court's equitable allocation are: (a) the parties' involvement in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (b) the parties' knowledge of the contamination or potential for contamination; (c) the parties' ability to pay their share of the cleanup costs; (d) the parties' degree of cooperation with government officials to prevent harm to the public health or environment; and (e) the efforts made, if any, to prevent environmental harm and resolve the case.[128]

---

[127] *United States v. Colo. & E. R.R. Co.*, 50 F.3d 1530, 1536 (10th Cir. 1995); *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992).

[128] *See Ker-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994); *Seneca Meadows*, 427 F. Supp. 2d at 292; *United States v. Davis*, 31 F. Supp. 2d 45, 65 (D.R.I. 1998) ("*Davis I*"); *Sea Lion*, 974 F. Supp. at 600.

b. Parties subject to apportionment

Although the several-liability regime is designed to ensure that a PRP is held liable *only* for its fair proportional share of the contamination and cleanup costs, if the combined responsibility of all parties before a court is less than the total responsibility for the contamination, one or more of the parties may be impelled to absorb the absent parties' responsibility.[129]

Vine Street has either not sued or dismissed prior owners of the West Glenwood and South Vine properties, the manufacturer of the Norg-Chlor solvent, the entity or entities that operated businesses on the South Vine property, and the entity that operated the dry-cleaning establishment on the West Glenwood property.  Likewise, at the time of trial Borg-Warner was no longer pursuing these entities as responsible parties.  Accordingly, the issue of these other entities' potential liability is not properly before the Court.  A district court has discretion to refuse to consider the relative fault of non-parties when allocating CERCLA liability, based on the parties' failure to present evidence concerning such relative fault.  *Am. Cyanamid*, 381 F.3d at 19.

Equity requires that the Court apportion liability to Vine Street and Borg-Warner only for their respective shares of the contamination.  But, because Vine Street bears the burden of proof for the equitable allocation, Vine Street must bear any residual portion of responsibility that is not attributable Borg Warner.

*2. Application*

a. The parties' involvement in the generation, transportation, treatment, storage, or disposal of the hazardous waste

---

[129] *See, e.g., Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1135 (10th Cir. 2002) (holding that the Court may equitably apportion among the PRPs the "orphan shares" of responsibility for the contamination attributable to defunct, insolvent, or judgment proof parties, or parties that cannot be located or identified); *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1303 (9th Cir. 1997) (same).

Vine Street has no connection to the generation, transportation, treatment, storage, or disposal of the PERC.  All of these events occurred before Vine Street acquired the properties.  There is evidence that Norge itself supplied College Cleaners with its initial PERC stock right before the 1961 grand opening.  However, it is unlikely that the PERC that Norge supplied constitutes a substantial amount of the PERC now in the soil and groundwater.  Therefore, Norge cannot be said to have transported a substantial amount of the hazardous substance that has contaminated the properties.  Likewise, there is no evidence that Norge actually generated or stored any of the PERC used at College Cleaners.

Nevertheless, Norge played a significant role in creating the contamination because its separators' inherent tendency to discharge significant amounts of PERC was the direct catalyst for the contamination.  Evidence shows that the PERC arrived at its current location through the Norge water separators' inherent tendency to discharge PERC.  Norge's, and therefore Borg-Warner's, degree of involvement in the PERC's disposal was significant.  Thus, Borg-Warner bears at least *some* responsibility for *all* of the PERC that entered the soil and groundwater at the West Glenwood and South Vine properties.

b. The parties' knowledge of the contamination or potential for contamination

There is no evidence that Vine Street or Borg-Warner knew anything about the actual contamination of the West Glenwood and South Vine properties before Steven Roosth received the results of the 2001 environmental assessment he commissioned for the South Vine property.  It is undisputed, however, that Vine Street was aware of the contamination when it finally purchased the South Vine property in November 2001.  Indeed, Steven Roosth testified that the South Vine property's contamination impelled Vine Street's "business decision" to purchase the property at its

52

full value after the Mitchell Family Partnership refused to discount the price.[130]   The fact that Vine

Street came into ownership of the South Vine property with full knowledge of its contamination

makes it arguable that Vine Street, an undisputed PRP, bears some measure of responsibility for the

cleanup.

There is significant circumstantial evidence that as early as 1964 Norge was aware of its dry-

cleaning machines' tendency to discharge PERC-laden wastewater.   Vine Street's undisputed

evidence shows that Norge either redesigned the machines or at least devised measures to

compensate for that tendency.   Norge's knowledge of its machines' tendency to discharge PERC

imposes on it significant responsibility for the contamination resulting from use of the 1961 models,

at least from 1964 onward.

c. The parties' ability to pay their share of the cleanup costs

Borg-Warner presented evidence that in May 2003 the Roosth and Genecov Groups—as

successors to B.M. & R. Interests ("B.M. &. R.")—made a "non waiver agreement" with Penn

National Insurance Company.[131]   Penn National had provided B.M. & R. liability coverage from

September 1966 to September 1984.[132]   In the 2003 agreement, Penn National accepted the Roosth

and Genecov Groups' insurance claim and "agreed to pay . . . . past, present and future costs incurred

by the Insured for remedial and investigative action related to the existence of PERC in the soils on

the [West Glenwood property] and in the groundwater . . . including but not limited to costs related

to remedial investigation, clean-up costs, response costs, and attorneys' fees related to the [TCEQ's

---

[130] Mar. 20, 2006 Trial Testimony.

[131] Fedders Exhibit 2.

[132] *Id.*

53

investigation and remediation of the site]" up to the policy limit of one million dollars per year.[133] Using the proceeds of this agreement, the Roosth and Gencov Groups through their insurer have reimbursed Vine Street for all but $64,085.16 of Vine Street's expenditures in connection with the PERC contamination.[134]  This unreimbursed amount corresponds to the attorneys' fees, costs, and expenses Vine Street incurred before the Roosth and Genecov Groups notified Penn National of their claim.[135]  The Genecov Group also directly reimbursed Vine Street for one-half of these uninsured out-of-pocket expenditures.[136]

Neither side submitted evidence about any Borg-Warner insurance agreements, if any exist. Counsel for Vine Street noted that "Borg-Warner is a multi-billion dollar company" and was "sure [Borg-Warner] is worth more than Penn National . . . . is."[137]  Neither side submitted any evidence calculating how much it will ultimately cost to clean up the contamination.  Likewise, Vine Street and Borg-Warner submitted no evidence as to their ability to finance the cleanup efforts.  Little can be inferred beyond the fact that Borg-Warner, a multi-billion dollar corporation, almost certainly has a greater ability to absorb the ultimate costs of cleanup beyond Penn National's policy limits.

    d.  The parties' degree of cooperation with government officials to prevent harm to the public health or environment

Vine Street insists that this factor weighs heavily in its favor because Vine Street "went into

---

[133] *Id.*; Mar. 20, 2006 Tr. at 15; Mar. 22, 2006 Tr. at 107.

[134] Mar. 20, 2006 Trial Testimony of Steven Roosth; Fedders Exhibit 45.

[135] Mar. 20, 2006 Testimony of Steven Roosth; Fedders Exhibit 45. Vine Street's expenditures made before the notification date are not compensable under B.M. & R.'s insurance policies.  Fedders Exhibit 45.

[136] Mar. 20, 2006 Testimony of Steven Roosth.

[137] Mar. 22, 2006 Tr. at 109.

the [TCEQ's] voluntary cleanup program" and "[e]very step of the way Vine Street has stepped up to the plate," whereas Borg-Warner "has tried to do everything [it] can to avoid responsibility."[138] The factor does not weigh against Borg-Warner.  Borg-Warner has steadily insisted that Vine Street prove Norge materials were at the West Glenwood property, but Borg-Warner's reasonable insistence that Vine Street prove its liability does not reflect a failure to cooperate with government officials to prevent further harm to public health or the environment.

Borg-Warner asserts that this factor actually weighs against Vine Street because Vine Street has refused to identify alternative funding under the TCEQ's Dry Cleaner Remediation Program ("DCRP"), which allows property owners to apply for up to $5,000,000 in state funding to remediate properties contaminated by dry-cleaning operations.  *See* TEX. HEALTH & SAFETY CODE §§ 374.001, et.seq.  Vine Street declined to participate because the program would require it to withdraw from the TCEQ's voluntary cleanup program and give the TCEQ control over all remediation activities.[139] Steven Roosth indicated that under the DCRP, remediation of the West Glenwood and South Vine properties could languish if DCRP funds were depleted or if the TCEQ gave other remediation projects higher priority.  *Id.*

Vine Street's decision to remain with the voluntary clean up program does not weigh against it.  There is no evidence that Vine Street's refusal to participate in the DCRP has slowed remediation efforts at the West Glenwood and South Vine properties.  At most, Vine Street declined to shift the costs of cleanup to the State of Texas.  This does not reflect a failure to cooperate with governmental officials in preventing further harm to the public health or the environment.

---

[138] *Id.* at 110.

[139] Mar. 20, 2006 Trial Test. of Steven Roosth.

      e. The efforts made, if any, to prevent environmental harm and the efforts made to resolve the case

According to Krasnoff, the PERC plume continues to spread at a rate of ten-to-fifteen feet per year.  The South Vine property lies at the southeast corner of the intersection of South Vine Avenue and West Glenwood Boulevard, and Vine Street's environmental experts anticipate that the plume has crossed under the street and into properties on the other corners of the intersection.[140] Given that the PERC plume is now estimated at 500 feet and Borg-Warner has been a party to this case for almost two years, this means that both Vine Street and Borg-Warner, as the only remaining defendant, are now responsible for at least twenty-to-thirty feet of the plume's continued expansion. Both parties have spent extraordinary sums in legal fees arguing over who should be responsible for the clean-up, but have wholly failed to spend any meaningful money or efforts at trying to work out a joint solution to stop the expansion and clean-up the problem.   Both parties have been referred to mediation several times, and the Court has encouraged the parties to try an work-out a creative business solution to this problem.  Instead, the parties have continued to spend their time and money litigating rather than resolving the dispute presenting this Court with an extremely complex environmental case with many difficult legal issues that have not been particularly well briefed by either side.  This may well be a classic case where the costs of fighting over who is responsible dwarfs the ultimate actual cost of restoration.  This is disappointing and makes this a difficult case.

      f. Conclusion

While the pollution happened many years ago, neither party intended to allow the discharge of PERC into the ground.  Nevertheless this Court, must decide this case under the law as enacted

---

[140] *Id*.

by Congress.  CERCLA requires PRP's to fund the clean up of their pollution; it is a strict liability statute.  The pollution at issue is serious, and someone must pay for the clean up.

Although Vine Street did not directly cause the contamination of the properties at issue, it did purchase the South Vine property with knowledge of its contamination and thus bears some responsibility for the cleanup of the property.  In addition, as the party bearing the burden of proof, Vine Street must absorb the responsibility not attributable to Borg-Warner.  Borg-Warner bears the majority of the responsibility since its Norge division designed and installed the separators, which had an inherent tendency to discharge PERC into the soil, creating the contamination.  But for Norge, there would have been no PERC and no vehicle for it to enter the drain system, destroy the sewer joints, and leak into the soil in the first place.  In addition, there was significant circumstantial evidence at trial that as early as 1964 Norge was aware of its dry-cleaning machines' tendency to discharge PERC-laden wastewater.  Further, although CERCLA is a strict liability statute, Norge is the only party shown to be actually responsible for the PERC leaking into the ground.  Weighing these considerations, the Court determines that Borg-Warner is responsible for 75% of the contamination of the West Glenwood property and surrounding properties and Vine Street is responsible for the remaining 25% of the contamination.

Now that the parties know their respective responsibilities, the Court hopes that the parties will make better efforts at jointly identifying and funding the clean-up of this site rather than continuing to spend their resources arguing over who is responsible.

*3. Equitable deduction of response costs already recovered from other sources*

 Borg-Warner argues that Vine Street should not recover its reimbursed response costs and that at most Vine Street should be able to recover its net costs—$32,042.58.  The Court agrees.  The

Court is unaware of any previous instance in which a private CERCLA claimant received reimbursements for nearly all its past and present response costs prior to any adjudication of responsibility. In the absence of any relevant case law on how to address the effect of such reimbursements, the Court derives guidance from cases that address the issue of double recovery more generally.

In government-prosecuted CERCLA actions, a non-settling responsible party's liability for the government's response costs is reduced by the dollar amount of previous settlements with the government.[141] The settling party's actual responsibility for the contamination is irrelevant to this reduction requirement. *See O'Neil*, 682 F. Supp. at 730. Once the CERCLA claimant obtains complete recovery from one or more responsible parties, that claimant cannot obtain additional recovery under CERCLA because this would create impermissible double recovery. *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 148–49 & n.7 (3d Cir. 1999) (adopting the common law "one satisfaction rule" from Restatement (Second) of Judgments § 49 cmt. a. (1982)).

Other CERCLA provisions also reflect Congress's apparent desire to prevent claimants from recovering the same response costs twice.[142] Thus, a court may consider "'preventing someone from recovering for the same harm twice'" as an equitable factor in resolving CERCLA contribution claims. *W. Props. Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 691 (9th Cir. 2004) (quoting *Boeing II*, 207 F.3d at 1189). This is consistent with the fact that private CERCLA claimants cannot recover

---

[141] 42 U.S.C. § 9613(f)(2); *see United States v. Broderick Inv. Co.*, 955 F. Supp. 1268, 1277 (D. Colo. 1997), *rev'd in part on other grounds sub nom. United States v. Burlington N. R. Co.*, 200 F.3d 679, 699–700 (10th Cir. 1999); *O'Neil v. Picillo*, 682 F. Supp. 706, 730 (D.R.I. 1988).

[142] *See, e.g.*, 42 U.S.C. §§ 9612(f) (prohibiting double recovery of response costs and other particular costs from the Hazardous Substance Superfund), 9614(b) (prohibiting claimants from recovering CERCLA response costs already recovered under other federal or state law).

58

damages resulting from contamination, but can only be reimbursed for some or all of their incurred response costs.[143]   Vine Street cannot make a profit on the contamination.

Vine Street argues that Texas's collateral source doctrine should prevent the Court from reducing Vine Street's recovery by what it has already been reimbursed.  The collateral source rule generally precludes a tortfeasor from obtaining the benefit of payments to the injured party from sources other than the tortfeasor.[144]   However, even if the Court were to agree with Vine Street that Texas substantive law applies to this issue, no court has ever applied the collateral source rule—a tort doctrine—in the context of CERCLA response-cost reimbursement.  Because CERCLA is not a vehicle for general tort recovery and the Court has a broad duty to consider facts bearing on the proper equitable allocation of response costs, the monies Vine Street has already recovered are relevant.

Vine Street also argues that because its reimbursements are not the product of any settlement of claims between Vine Street and the Roosth and Genecov Groups, no credit for settlement of claims is possible.  But equity prohibits a CERCLA claimant from being reimbursed more than once for the same response costs.  That Vine Street made no formal settlement agreement with the Roosth and Genecov Groups cannot enable Vine Street to recover monies from Borg-Warner that it has already recovered.  Further, notwithstanding the Roosth and Genecov Groups' assignments of legal interests to Vine Street, Vine Street did not plead and has never alleged it is asserting claims on

[143] *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2d Cir. 2000); *see Young*, 394 F.3d at 862 ("CERCLA is not a general vehicle for toxic tort claims.").

[144] *Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 626 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *see* Restatement (Second) of Torts § 920A (2006); *see also Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 934 (Tex. 1980) (applying the rule to insurance benefits).

behalf of those prior owners by virtue of such assignments.

Finally, the Court rejects Vine Street's argument that recovering all response costs from Borg-Warner would not result in double recovery because Vine Street has promised or is obligated to pay back the Roosth and Genecov Groups and/or Penn National for all reimbursements received. Vine Street gives no law to suggest this is a proper basis to allow it to recover more than its unreimbursed response costs from Borg-Warner, and Vine Street introduced no evidence to demonstrate any subrogation obligation.

Therefore, equity requires the Court to account for and deduct Vine Street's reimbursements from the amount that Borg-Warner must pay Vine Street with respect to its response costs.  This accounting and deduction does *not* affect the Court's equitable determination of Vine Street's and Borg-Warner's actual shares of liability for the contamination. The accounting and deduction only affects what Vine Street may *actually recover* from Borg-Warner based on Vine Street's prior reimbursement.

Because Borg-Warner seeks the equitable reduction, it bears the equitable burden to support its proposed amount.  Borg-Warner did not submit any evidence to the Court and did not articulate any basis for determining that Vine Street's $64,085.16 in out-of-pocket expenditures includes unrecoverable attorneys' and experts' fees.  Thus the Court finds that the $64,085.16 includes only recoverable response costs.  It is undisputed that the Genecov Group reimbursed Vine Street for one-half of this amount, thus Vine Street may recover at most only $32,042.58 from Borg-Warner.

F.   Conclusion

Borg-Warner is responsible for 75% of the contamination of the West Glenwood property and surrounding properties, and Vine Street is responsible for the remaining 25% of the contamination.  The Court deducts $400,793.61 as unrecoverable fees from the $574,576.28 that Vine Street contends are its total response costs through March 31, 2006, which leaves a total of $173,782.67.  However, Vine Street has received reimbursement for all but $32,042.58.  Borg-Warner's 75% responsibility of that amount totals $24,031.94.  Vine Street's 25% responsibility totals $8,010.64.

**Declaratory Relief**

Under CERCLA Section 113(g), the Federal Declaratory Judgment Act ("Federal DJA") (28 U.S.C. §§ 2201, et seq.), and the Texas Uniform Declaratory Judgments Act ("Texas DJA") (TEX. CIV. PRAC. & REM. CODE §§ 37.001, et seq.), Vine Street asks the Court to enter a declaratory judgment of Defendants' responsibility for (1) Vine Street's past response costs, (2) Vine Street's future response costs, and (3) payment of any government fines against Vine Street for the contamination.

CERCLA Section 113(g)(2) provides that "[i]n any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2).  This explicit language mandates declaratory relief in this case since Vine Street's implied contribution action arises under "an initial action for recovery of the costs referred to in [S]ection [107]."  Declaratory relief under CERCLA is required because Vine Street has proven

the elements of liability under Section 107(a).[145]  Accordingly, the Court declines to address Vine

Street's alternative statutory bases for declaratory relief because the parties make no argument that

the declaratory relief afforded under the alternative statutory bases would be any different.

Borg-Warner contends that this Court may not issue a declaratory judgment determining the

parties' future liability because assigning future liability is simply too speculative since there is no

remediation plan in place.  Borg-Warner argues that "[w]hen a party seeking contribution also seeks

a declaration of future liability, that party must also prove to the court what the future liabilities will

be, so that they can be divided."

Borg-Warner is mistaken for two reasons.  First, Section 113(g)(2) requires that the Court

issue a declaratory judgment determining the parties' future liability for response costs.  Second,

Vine Street seeks a declaration of future liability for the response costs incurred consistent with the

NCP—Vine Street does not ask the Court to determine now what those costs will be or to award

those costs in a present lump-sum payment.  *See Gussack Realty Co.*, 224 F.3d at 92 ("The proper

remedy for future response costs is not a present lump-sum payment of anticipated expenses but

instead a declaratory judgment award dividing future response costs among responsible parties.").

The speculative nature of future costs does not bar a present declaration of future liability for

those costs.  *Kelley*, 17 F.3d at 844.  Section 107(a) clearly provides that PRP's like Vine Street and

Borg-Warner are liable for their equitable shares of all necessary NCP-consistent response

costs—whether those costs are incurred by Vine Street, Borg-Warner, or someone else.  *See Boeing*

*v. Cascade Corp.*, 920 F. Supp. 1121, 1141 (D. Or. 1996) ("*Boeing I*"), *aff'd in part, remanded on*

---

[145] *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 865 (D.N.J. 2003); *see also Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844 (6th Cir. 1994).

*other grounds*, *Boeing II*, 207 F.3d at 1192.

The Court will not declare that Vine Street is entitled to a declaration of liability regarding future governmental fines or penalties.  Because no such fines or penalties have thus far been assessed, the issue is not ripe for judicial review.  Vine Street's other requests for declaratory relief are also not ripe for judicial review.[146]

The Court declares that Borg-Warner is liable for 75% of all past, present, and future necessary and NCP-consistent response costs for the contamination at issue.  Vine Street is liable for the remaining 25% of all such costs.

**Attorneys' Fees**

Vine Street seeks to recover its reasonable and necessary attorneys' fees and expenses incurred in this action.  Vine Street cannot recover its attorneys' fees as CERCLA response costs. *Key Tronic Corp. v. U.S.*, 511 U.S. 809, 818–19 (1994).  Nor can Vine Street otherwise recover attorneys' fees under CERCLA because Congress did not explicitly authorize recovery of such fees in private cost recovery actions.  *Id.* at 814–15.  Although Vine Street cited TCPRC §§ 38.001, et seq. in its complaint as a basis for an attorneys' fees award, no provision in that statutory chapter provides such a basis.[147]

Under the SWDA, Vine Street may recover "other costs as the [C]ourt, in its discretion, considers reasonable."  *See* TEX. HEALTH & SAFETY CODE § 361.344(a).  The SWDA provides no

---

[146] Vine Street also seeks a declaration of Borg-Warner's liability for "damages to improvements on the subject property related to any 'removal' or 'remedial' actions," "lost rental value on the subject property related to any 'removal' or 'remedial' actions," and "damages alleged by any third parties related to any 'removal' or 'remedial' actions on the subject properties related to the contamination on the subject property including but not limited to personal injury, property, loss of consortium, survival, wrongful death, and any other type of damages in any form," and permitting it to "supervise and control the monitoring and potential cleanup work even though the Defendants may be imposed liability for the costs therewith."  Vine St. Supp. Post-Trial Br. at 11–12.

[147] *See* Vine St.'s Compl. at ¶ 76 (Docket No. 240 at 17).

other cognizable basis for an award of attorneys' fees.  Texas courts have not determined whether

attorneys fees are appropriate under this "other costs" provision and there is no similar provision in

CERCLA.  *See R.R. Street I*, 166 S.W.3d at 306.  The Court declines to award fees pursuant to this

"other costs" provision.

**Prejudgment Interest**

Because the Court has determined that Vine Street's contribution action is implied by Section

107(a), Vine Street is eligible to receive prejudgment interest on the amounts it recovers.  *See* 42

U.S.C. § 9607(a)(4).  Prejudgment interest accrues "from the later of (i) the date payment of a

specified amount is demanded in writing, or (ii) the date of the expenditure concerned."  *Id*.  A

complaint constitutes sufficient written demand for payment, notwithstanding whether it specifies

an exact amount.  *In Re Bell Petroleum Servs.*, 3 F.3d 889, 908 (5th Cir. 1993).  Vine Street filed its

complaint against Borg-Warner on October 15, 2004, over two years after Vine Street made its last

unreimbursed expenditure.  Prejudgment interest on the $24,031.94 to which Vine Street is entitled

thus begins accruing from October 15, 2004.

The applicable interest rate is "the same rate as specified for interest on investments of the

Hazardous Substance Superfund established under sub-chapter A of chapter 98 of title 26."  42

U.S.C. § 9607(a)(4).  The Secretary of the Treasury determines the interest rate on advances made

to the Superfund "as of the close of the calendar month preceding the month in which the advance

is made." 26 U.S.C. § 9507(d)(3)(C).  For any given period, this rate is "equal to the current average

market yield on outstanding marketable obligations of the United States with remaining periods to

maturity comparable to the anticipated period during which the advance shall be outstanding."  *Id.*

The applicable interest rate for fiscal year 2004 was 1.27%.[148]  The applicable interest rate for fiscal

year 2005 was 2.21%.  *Id.*  The applicable interest rate for fiscal year 2006 was 4.11%.  *Id.*  Such

interest is compounded annually, and "comparable maturity" is determined with reference to the date

on which interest accruing under Section 107(a)(4) commences. *Id.*; 42 U.S.C. § 9607(a)(4)(ii).  The

parties submitted no calculations regarding the proper prejudgment interest rate applicable to the

$24,031.94 principal.  The Court awards prejudgment interest in the amount of $1433.10.[149]

## CONCLUSION

The Court, having entered these Findings of Fact and Conclusions of Law pursuant to Federal

Rule of Civil Procedure 52(a), **ORDERS**:

1. Borg-Warner is liable under CERCLA, Fedders and Maytag are not.

2. Borg-Warner is liable to under the SWDA, Fedders and Maytag are not.

3. Under CERCLA Section 107(a), Borg-Warner is responsible for 75% of the
   contamination of the West Glenwood property and surrounding properties; Vine Street
   is responsible for the remaining 25% of the contamination.

4. Under CERCLA Section113(g)(2), Borg-Warner is liable for 75% of all past, present,
   and future necessary costs of response to the contamination that are incurred consistent
   with the NCP; Vine Street is liable for the remaining 25% of such costs.

---

[148]   United States Environmental Protection Agency, *Superfund Interest Rates*.
http://www.epa.gov/ocfo/finstatement/superfund/int_rate.htm  (last visited Oct. 24, 2006).

[149]   *See United States v. Township of Brighton*, 153 F.3d 307, 321 (6th Cir. 1998) (noting the interest rate is
prescribed by statute and generally accepted accounting principals should be used to calculate the total. The only
information the district court needs to calculate the interest is the starting date for the calculation.).

The calculation is as follows: The principal amount of $24,031.94 at the 2004 rate of 1.27% is $305.205 per year, or
$.84 per day for 78 days (October 15, 2004-December 31, 2004) totaling $65.52. The new compounded principal
($24031.94 + $65.52) of $24,097.46 at the 2005 rate of 2.11% for twelve months is $508.46. The new compounded
principal (24,097.46 + $508.46) of $24,605.92 at the 2006 rate of 4.11% for ten months and six days is $859.12.

5.   Borg-Warner is liable to Vine Street for $24,031.94 in past response costs because of the reimbursements Vine Street has received.

6.   Borg-Warner is liable to Vine Street for $1433.10 in prejudgment interest running from October 15, 2004- November 6, 2006.

7.   All pending motions are **DENIED** as moot and other relief sought is **DENIED**.

**So ORDERED and SIGNED this 6th day of November, 2006.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**



Sample Location Map
Vine Street Properties
Tyler, Texas